CA NO. 20-50008

IN THE UNITED STATES COURT OF APPEALS

FOR THE NINTH CIRCUIT

UNITED STATES OF AMERICA,

        Plaintiff-Appellee,

v.

TODD KAMAWU PAISHON,

        Defendant-Appellant.

DC NO. 2:19-cr-00304-PA-2

---

**APPELLANT'S OPENING BRIEF**

---

APPEAL FROM THE UNITED STATES DISTRICT COURT FOR THE
CENTRAL DISTRICT OF CALIFORNIA

HONORABLE PERCY ANDERSON
United States District Judge

CUAUHTEMOC ORTEGA
Interim Federal Public Defender
GIA KIM
Deputy Federal Public Defender
321 East 2nd Street
Los Angeles, California 90012-4202
Telephone: (213) 894-4408
Facsimile: (213) 894-0081
Email: Gia_Kim@fd.org

Attorneys for Defendant-Appellant

# TABLE OF CONTENTS

**Page**

I.    QUESTIONS PRESENTED ...................................................1

II.   STATUTORY PROVISION INVOLVED ..............................1

III.  STATEMENT OF JURISDICTION ....................................2

IV.  BAIL/DETENTION STATUS ...........................................2

V.   STATEMENT OF THE CASE ...........................................2

    A.    The Traffic Stop .................................................2

    B.    Indictment .........................................................9

    C.    Motion to Suppress ............................................9

        1.    Briefing on Motion to Suppress ..............10

        2.    The District Court's Denial of the Motion to Suppress ............13

    D.    The Evidence at Trial ........................................15

    E.    Sentencing .......................................................29

VI.  SUMMARY OF ARGUMENT .........................................31

VII. ARGUMENT ...................................................................33

    A.    The District Court Erred in Denying Paishon's Motion to Suppress the Unwarned Statements She Made While Handcuffed in the Back of a Police Car. ................................................33

        1.    This Court's Decision in *Henley* Is Controlling on the Custody Question. ........................................33

        2.    The Error Was Not Harmless Beyond a Reasonable Doubt. .....38

    B.    Special Condition 9 ("True Legal Name") and Standard Condition 14 ("Special Risks") Must Be Vacated. ..............................................41

# TABLE OF CONTENTS

**Page**

VIII. CONCLUSION...............................................................52

CERTIFICATE OF RELATED CASES ..................................53

CERTIFICATE OF COMPLIANCE.......................................54

# TABLE OF AUTHORITIES

**Page(s)**

## Federal Cases

*Berkemer v. McCarty*,
468 U.S. 420 (1984)......................................................................34, 37

*Crowder v. Diaz*,
No. 2:17-CV-1657-TLN-DMC, 2019 WL 3892300 (E.D. Cal.
Aug. 19, 2019) ...........................................................................44

*Dickerson v. United States*,
530 U.S. 428 (2000)...........................................................................34

*Henderson v. United State*s,
568 U.S. 266 (2013)...........................................................................51

*Howes v. Fields*,
565 U.S. 499 (2012)......................................................................37, 38

*In re Crawford*,
194 F.3d 954 (9th Cir. 1999) ...............................................................44

*Love v. Johnson*,
146 F. Supp. 3d 848 (E.D. Mich. 2015) .............................................44

*Miranda v. Arizona*,
384 U.S. 436 (1966)...................................................................6, 33, 34

*Missouri v. Seibert*,
542 U.S. 600 (2004)...........................................................................11

*United States v. Abbouchi*,
502 F.3d 850 (9th Cir. 2007) ...............................................................51

*United States v. Barnes*,
713 F.3d 1200 (9th Cir. 2013) .................................................34, 37, 38

*United States v. Barsumyan*,
517 F.3d 1154 (9th Cir. 2008) .............................................................51

*United States v. Bassignani*,
575 F.3d 879 (9th Cir. 2009) ...............................................................38

iii

# TABLE OF AUTHORITIES

**Page(s)**

**Federal Cases (cont.)**

*United States v. Bernal-Obeso*,
    989 F.2d 331 (9th Cir. 1993) ...............................................................39

*United States v. Cazares*,
    788 F.3d 956 (9th Cir. 2015) ...............................................................33

*United States v. Evans*,
    883 F.3d 1154 (9th Cir. 2018) ......................................................41, 50

*United States v. Garibay*,
    143 F.3d 534 (9th Cir. 1998) ...............................................................40

*United States v. Henley*,
    984 F.2d 1040 (9th Cir. 1993) ....................................10, 34, 35, 36

*United States v. Joseph*,
    716 F.3d 1273 (9th Cir. 2013) ......................................42, 50, 51, 52

*United States v. Kim*,
    292 F.3d 969 (9th Cir. 2002) ...............................................................37

*United States v. LaCoste*,
    821 F.3d 1187 (9th Cir. 2016) .............................................................51

*United States v. Magdirila*,
    962 F.3d 1152, 2020 WL 3424930 (9th Cir. June 23, 2020) ......................49, 50

*United States v. Newton*,
    369 F.3d 659 (2d Cir. 2004) ...............................................................36

*United States v. Noti*,
    731 F.2d 610 (9th Cir. 1984) ...............................................................41

*United States v. Ortiz*,
    735 F. App'x 419 (9th Cir. 2018) .................................................46, 47

*United States v. Ped*,
    943 F.3d 427 (9th Cir. 2019) .......................................................49, 51, 52

iv

# TABLE OF AUTHORITIES

**Page(s)**

**Federal Cases (cont.)**

*United States v. Soltero*,
    510 F.3d 858 (9th Cir. 2007) ...............................................................46

*United States v. Weber*,
    451 F.3d 552 (9th Cir. 2006) ........................................................41, 42

*United States v. Williams*,
    356 F.3d 1045 (9th Cir. 2004) ....................................................42, 43

*United States v. Williams*,
    435 F.3d 1148 (9th Cir. 2006) .............................................................39

*United States v. Wolf Child*,
    699 F.3d 1082 (9th Cir. 2012) ....................................................43, 48

**Federal Constitution, Statutes, and Sentencing Guidelines**

18 U.S.C. § 2 ...............................................................................................2, 9

18 U.S.C. § 1708 .........................................................................................2, 9

18 U.S.C. § 3231 ............................................................................................2

18 U.S.C. § 3553 .......................................................................................1, 42

18 U.S.C. § 3583 ..................................................................................1, 42, 49

28 U.S.C. § 994 .............................................................................................49

28 U.S.C. § 1291 ............................................................................................2

U.S.S.G. § 5D1.3 ...........................................................................................49

U.S. Const., amend. V ...................................................................................33

# TABLE OF AUTHORITIES

**Page(s)**

**Other Authorities**

CDC, *Patient-Centered Care for Transgender People: Recommended Practices for Health-Care Settings (Patient-Centered Strategies in Health Care)*, https://www.cdc.gov/hiv/clinicians/transforming-health/health-care-providers/affirmative-care.html#strategies ............................45

CDC, *Patient-Centered Care for Transgender People: Recommended Practices for Health-Care Settings*, https://www.cdc.gov/hiv/clinicians/ transforming-health/health-care-providers/affirmative-care.html ...................................................45

*Merriam-Webster Dictionary*, https://www.merriam-webster.com/dictionary/detain (last visited May 19 2020) ...............................35

United States District Court, Central District of California, General Order 18-10, https://www.cacd.uscourts.gov/sites/default/files/general-orders/GO%2018-10.pdf (Nov. 2, 2018)............................................................30

# I. QUESTIONS PRESENTED

A.    Did the district court err in concluding that appellant Todd ("Nadine") Paishon was not in custody when she was handcuffed in the back of a police car and told she was being "detained"? And does the admission of her unwarned statements at trial require reversal?

B.    Did the district court (1) abuse its discretion by imposing a supervised-release condition that prevents Paishon, a transgender woman, from using her preferred first name in social situations without prior written approval from the probation officer; and (2) abuse its discretion or plainly err by imposing a notification of "specific risks" condition that this Court has already held to be unconstitutionally vague?

# II. STATUTORY PROVISION INVOLVED

**18 U.S.C. § 3583. Inclusion of a term of supervised release after imprisonment.**

**(d) Conditions of Supervised Release**

. . . .

The court may order, as a further condition of supervised release, to the extent that such condition—

(1) is reasonably related to the factors set forth in section 3553(a)(1), (a)(2)(B), (a)(2)(C), and (a)(2)(D);

(2) involves no greater deprivation of liberty than is reasonably necessary for the purposes set forth in section 3553(a)(2)(B), (a)(2)(C), and (a)(2)(D); and

(3) is consistent with any pertinent policy statements issued by the Sentencing Commission pursuant to 28 U.S.C. 994(a)[.]

1

## III.  STATEMENT OF JURISDICTION

On January 13, 2020, the Honorable Percy Anderson, United States District Judge, sentenced appellant Todd Paishon to 27 months of imprisonment, to be followed by three years of supervised release, following her conviction for possession of stolen mail/aiding and abetting, in violation of 18 U.S.C. §§ 1708, 2. (ER 52; CR 152.)[1]

The judgment was entered on January 15, 2020.  (ER 552; CR 152.) Paishon filed a timely notice of appeal on January 16, 2020.  (ER 544; CR 153.)

The district court had jurisdiction pursuant to 18 U.S.C. § 3231.  This Court has jurisdiction pursuant to 28 U.S.C. § 1291.

## IV.  BAIL/DETENTION STATUS

According to the Bureau of Prisons' website, Paishon is in federal custody, and her projected release date is July 17, 2021.

## V.  STATEMENT OF THE CASE

**A.    The Traffic Stop**

At approximately 3:11 a.m. on February 16, 2019, San Gabriel Police Officer David Martinez saw Marco Contreras run down the street with multiple

---

[1] "ER" refers to Appellant's Excerpts of Record and is followed by the applicable page number.  "CR" refers to the district court clerk's record and is followed by the applicable docket control number.

envelopes in his arms.  (ER 117.)  Officer Martinez watched as Contreras got into

the passenger seat of a car, which was stopped nearby with its lights on, and the car

drove off.  (ER 117.)  Soon thereafter, Officer Martinez stopped the car on the

basis of his observations and an expired registration.  (ER 117.)

Officer Martinez immediately informed the driver, Paishon, that he had

stopped her because of the expired registration.  (Ex. A at 01:10;[2] ER 84.)  He then

asked for her driver's license, and Paishon told Officer Martinez that she didn't

have it with her and that her license was suspended.  (Ex. A at 01:19, 01:28; ER

84.)  Martinez asked Paishon and Contreras if they had identification.  (Ex. A at

01:30, 01:32; ER 84.)  They each responded that they did not have identification

on them.  (Ex. A at 01:31, 01:34; ER 84.)  Officer Martinez then instructed Paishon

to turn off the car.  (Ex. A at 01:35; ER 84.)

After calling dispatch, Officer Martinez asked Contreras his name, whether

anyone was on probation, his birthday, the city on his ID, and his ID number.[3]

(Ex. A at 04:46-05:30; ER 85-86.)  Officer Martinez then asked Paishon her name

---

[2] Throughout this brief, timestamps correspond to the dashcam video
submitted to the district court as Exhibit A and previously filed in this Court as
Exhibit A to Paishon's motion for bail pending appeal.  (Dkt. No. 17.)  For the
Court's convenience, parallel appendix citations refer to the transcript.

[3] Contreras lied and said that his name was Charlie Zavala, and that he was
not on probation.  (Ex. A at 4:52-4:59; ER 85-86.)

3

and date of birth, and whether she knew her ID number.  (Ex. A at 05:34-5:50; ER 86-87.)  She answered his questions truthfully.  (Ex. A at 05:37-05:55; ER 86-87.)  He then instructed her to close the door.  (Ex. A at 5:57; ER 87.)  Officer Martinez gave a dispatcher Paishon's information, and the dispatcher confirmed that Paishon's driver's license was suspended.  (Ex. A at 8:10-9:20; ER 88.)

At this point, Officer Martinez ordered Paishon to get out of the car, and after she did, he patted her down for weapons.  (Ex. A at 10:04; ER 88.)  He instructed her to have a seat on the curb, kick out her feet, and cross her ankles.  (Ex. A at 10:31; ER 88.)  He then asked a series of questions unrelated to the expired registration or her suspended license.  Specifically, he asked, "Where are you guys coming from?" and "I saw-w-where's he [Contreras] coming from?"  (Exh. A at 10:31, 10:47; ER 88.)  When Paishon responded that she had picked up Contreras, who had come from a friend's house, Martinez asked her if she knew the address of the friend.  (Ex. A at 10:50-10:54; ER 89.)  She said that she did not, and that she had picked up Contreras while he was walking outside.  (Ex. A at 10:55; ER 89.)

Immediately after Paishon made these curbside statements, Officer Martinez told her that she was "not under arrest right now," and that she was "just being detained."  (Ex. A at 11:05; ER 89.)  He then placed Paishon in handcuffs with her hands behind her back, told her he was doing so "for safety" because of the "time

4

of day," and reiterated that she was "not under arrest." (Ex. A at 11:10-11:18; ER 89.) He asked her where she lived, and if there was any contraband in the vehicle, such as drugs or weapons. (Ex. A at 11:27-11:45; ER 89.) He reminded her that her driver's license was suspended. (Ex. A at 11:38; ER 89.)

Another officer then said, "Put her in the back of the car." (Ex. A at 11:47; ER 90.) As Officer Martinez did so, he told Paishon, "All right, so you're not under arrest, I'm just going to put you in the back of this car. ¶ Just being detained, okay? You're not under arrest." (Ex. A at 11:49-12:09; ER 90.) Officer Martinez then closed the door of the car. (Ex. A at 11:47-12:09; ER 90.)

Just after placing the handcuffed Paishon in the back of the police car, Officer Martinez had Contreras sit on the side of the road (after patting him down) and questioned him about his identity and the mail. (Ex. A at 12:21-18:34; ER 90-95.) Contreras continued to lie about his identity until about 20 minutes into the stop. (Ex. A at 20:27-20:32; ER 95.) Once Contreras finally provided his true name and date of birth to officers, they learned that, contrary to what he had told them earlier, he actually was on probation. (Ex. A at 23:44-24:14; ER 98.)

Prior to confirming Contreras's probation status, officers had begun searching the car, and Officer Martinez removed the stolen mail from the passenger side of the car. (Ex. A at 21:28.) Officers continued to search the car, including the trunk, and removed its contents. (Ex. A at 21:30-33:41.) In addition

to 44 pieces of mail on the passenger seat floorboard, some of which was in plain view, the search turned up a makeshift tool used to "fish" for mail inside mailboxes.  (ER 118-120.)

Twenty-five minutes into the traffic stop, and fifteen minutes after being handcuffed in the back of the police car, Paishon had still not been advised of her right to remain silent under *Miranda v. Arizona*, 384 U.S. 436 (1966).  Nevertheless, Officer Martinez began to ask Paishon a series of questions.  He asked her if the car was hers; when she said it was not, he asked if it was stolen (she said it was not).  (Ex. A at 26:51-26:57; ER 98-99.)  He then asked, "What's up?  What were, honestly, what were you guys doing," followed by "Okay, what's up with the mail?"  (Ex. A 26:57-27:01; ER 99.)  He then repeated that question about the mail, and when Paishon said that it was already in the car, Officer Martinez said, "It was already in the car?"  (Ex. A at 27:03-27:06; ER 99.)  He then asked her if she was lying to him and told her that he's been doing this for a lot longer than she thinks.  (Ex. A at 27:07-27:10; ER 99.)  When Paishon replied, "No, I know," Martinez said, "Come on."  (Ex. A at 27:11-27:12; ER 99.)  Officer Martinez continued, "So you're not willing to tell me where you guys got the mail?  It's fresh, from our city."  (Ex. A at 27:20; ER 99)  He told Paishon twice that he had seen Contreras running down the street with mail, and he added that he knew she was picking him up.  (Ex. A at 27:24-27:36; ER 99-100.)  He asked again

about the mail, this time even more directly, and suggested that Paishon was lying: "So what — so you guys out here just trying to get mail or what, just be honest with me?" (Ex. A at 27:37; ER 100.)

Officer Martinez then asked Paishon a series of questions about the car she'd been driving – whose car it was, where she'd gotten it from, where the car's owner (Paishon's friend) lived, and at what time Paishon had retrieved the car from her friend. (Ex. A at 27:43-28:22; ER 100-101.) When Paishon said that she'd gotten the car a couple of hours ago, maybe at 12:30 a.m., the officer said "it's not even 12:30 yet . . . . It's not 12:30. It's barely 11:00," despite the fact that it was past 3:30 a.m. (Ex. A at 28:14-28:36; ER 101.) As Paishon said he was "lying" and asked if he was "serious" about the time, Martinez shut the door to the police car and walked away. (Ex. A at 28:36; ER 101.)

At various points after Officer Martinez engaged in pre-*Miranda* questioning of Paishon while she was handcuffed in the back of the vehicle, but before he gave the required *Miranda* warnings, Paishon made spontaneous statements to the officers.[4] For instance, approximately five minutes after making pre-*Miranda* statements regarding the mail and the car, Paishon asked another officer to bring Martinez to talk to her. (Ex. A at 33:25; ER 103.) When Martinez arrived,

---

[4] Paishon did not seek to suppress these statements, which are summarized in this paragraph. (ER 68 n.3.)

7

Paishon told him, "I just came to pick him up.  When he came in the car, um—

I'mma be honest with you, like he had put all that stuff on the ground."  (Ex. A at

33:48; ER 103)  She asked to speak to Martinez again a few minutes later  (Ex. A

at 37:18; ER 105.)  Ten minutes after that, she told another officer that she "just

came her to pick [Contreras] up and then he puts — he came with all that."  (Ex. A

at 46:24; ER 107.)  She asked to speak to or relay a message to Martinez several

more times.  (Ex. A at 47:09, 47:30, 56:03; ER 107, 109.)

Approximately 42 minutes into the stop, Officer Martinez placed the large

pile of mail that he had removed from the car Paishon had been driving onto the

hood of the police car in which she was detained.  (Ex. A at 43:07.)  While wearing

gloves, he then examined the mail for several minutes.  (Ex. A at 43:07-49:57.)

The officers continued their investigation, and approximately one hour into

the stop, while Paishon remained handcuffed in the back of the police car, Officer

Martinez finally advised Paishon of her Fifth Amendment rights.  (Ex. A at

1:00:47; ER 109)  He then asked her if she understood those rights, and she

answered, "Yes, but I—."  (Exh. A at 1:01:01; ER 109.)  Officer Martinez

immediately cut her off by confronting her with evidence of her guilt:

> I just talked to [Contreras], he said that you're bullshitting
> and that she — he said that that mail was already in there,
> so what's the truth?  Bullshit aside, because he just told me
> that, that you're scandalous like that and you like to switch
> up on people and that — that mail was already there when
> he got there and he . . .  That's what he told me.

8

(Ex. A at 1:01:02-20; ER 109.)  He then followed up by asking Paishon a series of questions about what happened that night, almost all of which covered the same topics that he had questioned her about earlier: when she had picked up Contreras, who brought the stolen mail into the car, where she had gotten the car, whether she knew what fishing was, and what her previous arrests were for.  (Ex. A at 1:01:29-1:02:45; ER 110-112.)  Paishon answered his questions.  *Id.*

Officer Martinez then told her that both she and Contreras were under arrest and closed the police car door again.  (Ex. A at 01:02:46; ER 112.)  Several minutes later, he drove Paishon to the police station; she was taken out of the car approximately an hour and fiftenn minutes after the stop began.  (Ex. A at 01:18:01; ER 115.)

## B.   Indictment

On May 17, 2019, a single-count indictment was filed in the Central District of California charging Paishon and co-defendant Marco Contreras with possession of approximately 44 pieces of stolen mail, in violation of 18 U.S.C. §§ 1708(a), 2(b).  (ER 58-59; CR 16.)

## C.   Motion to Suppress

Prior to trial, Paishon moved to suppress several sets of statements she made during the traffic stop as obtained in violation of her Fifth Amendment privilege against self-incrimination.  (ER 60-80.)

### 1. Briefing on Motion to Suppress

Paishon sought to suppress three sets of statements: the curbside statements (approximately 10:31 to 11:45 on the dashcam video), the pre-*Miranda* statements made while she was handcuffed in the back of the police car (26:50-28:36), and the post-*Miranda* statements (1:01:01 to 1:03:02). (ER 65.)

- *Curbside statements*: Paishon argued that Officer Martinez's questions regarding where she was coming from, where Contreras was coming from, and the specific address Contreras was coming from exceeded the scope of a routine traffic stop, and were not reasonably related to her expired registration tag or suspended license. (ER 70-73.) Further, Paishon argued, a reasonable person detained in her situation on the curb would not have felt free to leave, and Martinez's questions constituted interrogation, because they were reasonably likely to elicit an incriminating response. (ER 72-73.)

- *Pre-*Miranda *statements in the police car*: Relying primarily on this Court's decision in *United States v. Henley*, 984 F.2d 1040, 1042 (9th Cir. 1993), Paishon argued that she was in custody and subjected to interrogation while sitting handcuffed in the back of a police car, after being told that she was being "detained" for officer safety. (ER 73-75.) As a result, she contended, her responses to this portion of

Martinez's questioning — more than 26 minutes into her detention, and more than 30 minutes prior to receiving *Miranda* warnings — should be suppressed. (ER 74-75.)

- *Post*-Miranda *statements*: Paishon challenged statements she made after being given the *Miranda* warning as unlawful under *Missouri v. Seibert*, 542 U.S. 600 (2004), which held that a deliberate "technique of interrogating in successive, unwarned and warned phases" violates *Miranda*. *Id.* at 609. She noted the significant overlap between the pre-*Miranda* and post-*Miranda* interrogation, the reference to pre-*Miranda* statements in the post-*Miranda* questioning, the short passage of time, and the continuity of setting and police personnel. (ER 75-79.) In the absence of curative measures, Paishon argued, Officer Martinez's rushed recitation of the *Miranda* warning was ineffective to apprise her of her rights. (ER 79-80.)

The government replied that none of the statements violated Paishon's Fifth Amendment right against self-incrimination. As to the curbside statements, the government argued that Officer Martinez had reasonable suspicion of a theft or burglary offense by the time the questioning occurred, the stop was not unnecessarily prolonged, and Paishon was not in custody while on the curb. (ER 133-137.) Further, the government contended that Paishon was not in custody

11

when she sat handcuffed in the back of a police car, as she was told she was not under arrest and that she was being handcuffed for officer safety, the interrogation was short, and she was not confronted with evidence of her guilt; alternatively, the government argued that the environment was not sufficiently coercive so as to require *Miranda* warnings.  (ER 137-141.)  The government urged the court not to suppress the post-*Miranda* warnings under *Seibert* because the pre-*Miranda* statements did not amount to a confession or incriminating statement, and the timing, nature, and content of the questioning and statements did not demonstrate a deliberate two-step process. (ER 141-145.)  In any event, the government argued, the mid-stream *Miranda* warnings were effective.  (ER 146.)

In reply, Paishon reiterated that all three sets of statements should be suppressed.  (ER 153.)  Paishon argued that Officer Martinez did not have particularized reasonable suspicion to believe that she — as distinguished from Contreras — had engaged in theft of burglary, and that the curbside interrogation thus exceeded the permissible scope of a *Terry* stop.  (ER 153-156.)  With respect to the pre-*Miranda* statements, Paishon argued that the government had failed to distinguish *Henley* on the in-custody status of a person detained, handcuffed, in the back of a police car, and that the length of the interrogation was irrelevant to the custody question.  (ER 156-159.)  Finally, Paishon argued that the pre-*Miranda* statements were sufficiently inculpatory to make *Seibert* applicable, that the pre-

12

*Miranda* statements were nearly identical to the post-*Miranda* statements, and that the other circumstances demonstrated a deliberate two-step interrogation that was cured by Martinez's hasty and ineffective midstream warning. (ER 160-165.)

## 2. The District Court's Denial of the Motion to Suppress

While the district court did not hold an evidentiary hearing on the motion,[5] it discussed the suppression issues with the parties on several occasions.

At a July 8, 2019, pretrial conference, the district court questioned the parties regarding the motion to suppress. First, it asked the parties whether Paishon's curbside, pre-*Miranda*, and post-*Miranda* statements were inculpatory. (ER 170.) Both the government and defense counsel confirmed that they viewed the statements as inculpatory. The government argued that the statements were "inculpatory due to their inconsistency," and defense counsel maintained that the statements were inculpatory even if they were not a confession. (ER 170-176.) The government indicated that they wished to offer, as part of their case-in-chief,

> statements related to where the car is coming from, and who obtained it, as well as the defendant's statements on the mail, inconsistent statements on the mail and how it ended up in the vehicle . . . . For example, . . . it was in there when [Paishon] got the car versus Contreras brought it in versus later on, that she was actually driving, Contreras asked her to stop. He got back and got it.

---

[5] The parties agreed that an evidentiary hearing was unnecessary. (ER 146-147, 165 n.6.)

(ER 176-177.)  The district court clarified that Contreras, in a post-*Miranda* statement, said that the mail was already in the car when he got in.  (ER 185.) Finally, the parties discussed whether *Seibert* applied to the facts of this case, where Paishon did not confess in the pre-*Miranda* statement.  (ER 187-192.)

At a status conference on July 12, 2019, the district court asked questions to clarify the timeline of spontaneous statements made by Paishon before being administered *Miranda* warnings, as well as the substance of Paishon's post-arrest statement to a postal inspector, months after the traffic stop.  (ER 195-200.)

On August 27, 2019, the district court heard additional argument on the suppression motion.  (ER 3-6.)  The district court then orally denied the motion, without a written order, as to the curbside statements, the pre-*Miranda* statements, and the post-*Miranda* statements:

> None of the statements, in the Court's view, violated the defendant's Fifth Amendment rights.
>
> First, the curbside statements were proper because . . . the officer's investigatory questions were reasonably related in scope to a justification for the stop.
>
> . . . .
> The pre-*Miranda* statements were proper because the defendant was not in custody at the time the statements were made.  The defendant was handcuffed only for officer safety, a fact that she was made aware of, and she was told numerous times that she was only — she was not under arrest, and the questioning only occurred for a brief period of time.

14

> And, finally, the post-*Miranda* statements were proper because they were provided after the defendant received valid *Miranda* warnings. And the facts, in the Court's view, make it clear that they were not obtained during [a] deliberate and an improper course, two-step inquiry as outlawed in *Missouri v. Seibert*.

(ER 6-7.)

## D. The Evidence at Trial

Paishon proceeded to a trial by jury. The government's theory of the case was that Paishon and Contreras planned to fish for mail and cash fraudulent checks on February 16, 2019, and that, when stopped by Officer Martinez, they agreed to tell him "the same story," that the mail was already in the car when they borrowed it. (ER 218.) Contreras would testify to this version, the government explained, and Paishon's "admissions" — including her statement to Martinez "that the mail was already in the car when she borrowed it" — would "corroborate Contreras's explanation." (ER 218.)

Paishon's defense, by contrast, was that she was an unwitting getaway driver: she and Contreras had been driving to a friend's house when Contreras asked her to pull over, got out of the car, and twice returned carrying piles of envelopes. (ER 220.) The defense stated that the government's case rested on the word of Contreras, a convicted felon with a history of mail theft and lying to law enforcement and a vested interest in pointing the finger at Paishon. (ER 223-224.)

15

The government called Officer Martinez to testify regarding the events of February 16, 2019.  (ER 227.)  Martinez testified that at approximately 3:00 a.m., while patrolling in a police car near the corner of Las Tunas Drive and Alabama Street, he saw a car stopped with its lights on and a driver inside.  (ER 227-228.) Martinez then saw a man, who turned out to be Contreras, run away from a local business with white envelopes in his arms and get into the passenger seat of the stopped car.  (ER 228.)  The car drove away at a normal rate of speed; Martinez made a U-turn to follow the car and pulled it over based on his observations and an expired registration tag.  (ER 230-231, 253.)

Officer Martinez approached the occupants of the car.  (ER 231.)  Paishon, the driver, gave her true legal name.  (ER 232.)  Contreras, the passenger, gave the false name "Charlie Zavala."  (ER 232.)  Officer Martinez told Paishon and Contreras to get out of the car.  (ER 234.)

Officer Martinez saw mail on the floorboard of the passenger seat, in a quantity greater than he had seen in Contreras's arms.  (ER 234-235.)  A search of the car revealed more mail, all in the front passenger floorboard area.  (ER 235-237)  Most of the mail was stuck together with an adhesive.  (ER 238.)  From the passenger side, Martinez also recovered a "fishing tool," or strap attached to a 6" by 8" pad, weighed down by coins and covered in a strong adhesive.  (ER 239-241, 254.)  Four or five pieces of mail were stuck to the pad when Martinez retrieved it.

16

(ER 242.)  Some of the mail belonged to CBC Education, a business located in the area where the car was stopped.  (ER 249-251.)  Martinez found no other contraband or evidence of identity theft in the car.  (ER 258-259.)

The government played multiple clips of Paishon's statements to Officer Martinez, as recorded by Martinez's dashcam.[6]  First, it played a statement Paishon made after Martinez told her to step out of the car, frisked her and patted her down, and had her sit on the curb with her feet kicked out and her ankles crossed.  (ER 260-262.)  Martinez asked Paishon where Contreras was coming from, and she said he had been at a friend's house, and that she had picked him up on the street.  (ER 245; Govt. Ex. 6, 10:40-11:05 [ER 88-89].)

Next, the government played statements Paishon made to Officer Martinez about where she had gotten the mail and where and when she had gotten the vehicle.  (ER 245.)  Paishon made these statements after being told to place her hands behind her back, handcuffed, walked over to the police car, and placed in the back.  (ER 245, 262-264.)  Martinez asked questions while he stands between the seated, handcuffed Paishon and the patrol-car door:

> Officer Martinez: 00:26:50 Is this your ride?
>
> Paishon: 00:26:51 No.

---

[6] Although it is the recordings, and not the transcript excerpts, that are in evidence, for the Court's convenience, appellant provides parallel citations to the transcript in this motion.

Officer Martinez: 00:26:51 It's not your ride? Whose ride is it?

Paishon: 00:26:54 It's my girlfriend's.

Officer Martinez: 00:26:56 Is it stolen?

Paishon: 00:26:57 No.

Officer Martinez: 00:26:57 What's up? What were, honestly, what were you guys doing?

Paishon: 00:27:00 I had just came to pick him up.

Officer Martinez: 00:27:01 Okay, what's up with the mail?

Paishon: 00:27:03 Huh?

Officer Martinez: 00:27:03 What's up with the mail?

Paishon: 00:27:05 That was already in the car.

Officer Martinez: 00:27:06 It was already in the car?

Paishon: 00:27:06 Yeah.

Officer Martinez: 00:27:07 Are you lying to me?

Paishon: 00:27:09 No.

(ER 245; Govt Ex. 7, 26:50-27:09 [ER 98-99].)  Contreras, likewise, had stated that the mail was already inside the car.  (ER 247; Govt. Ex. 19, 17:15-17:26 [ER 94].)  Martinez asked Paishon again about the car, who said it belonged to her friend, Brit Moore, and that she had gotten it a couple hours ago.  (ER 245; Govt. Ex. 8, 27:44-28:20 [ER 100-101].)

18

Still handcuffed in the back of the police cruiser, Paishon called out to Martinez and stated, "Ok, look, I just came to pick him up. When he came in the car, um- I'mma be honest with you, like he had put all that stuff on the ground." (ER 246, 266-268; Govt. Ex. 9, 33:48-34:00 [ER 103].)

About half an hour later, after reading Paishon her *Miranda* rights, Martinez questioned her again about picking up Contreras. Paishon stated that she had gone to pick up Contreras at his request, and that he had all the mail when she picked him up. (ER 246; Govt. Ex. 10, 1:00:47-1:02:21 [ER 109-111].)

Several witnesses testified regarding the stolen mail. Poch Blanco, the CEO and president of Med Quick pharmacy, testified that he sends prescription drugs through the U.S. mail, sometimes utilizing the blue collection boxes at the corner of Del Mar and Las Tunas. (ER 289-292.) In February 2019, customers had called to complain that they had not received their prescriptions. (ER 292-294.) Karen Banh, a clerk at Oriental Air Logistics, testified that a company vendor check was never delivered and that she had been notified that by USPS that it had been stolen; her coworker, Kent Luk, had dropped off company mail in a mailbox on Las Tunas Drive on February 15, 2019. (ER 305-314.) Blanco, Banh, and Luk testified that they did not know Paishon and Contreras, and had not given them permission to possess their mail. (ER 296, 310, 315-316.)

19

Postal inspector Alyssa Rodriguez testified as an expert witness.  (ER 297-300.)  She testified that that mail thieves in the San Gabriel Valley area typically steal mail from blue postal collection boxes and residential mailboxes.  (ER 301.)  Rodriguez testified that the cardboard item found in the car was a fishing device used to steal mail from blue collection boxes, and that it could probably gather only a couple of pieces of mail per drop.  (ER 302-304.)  Rodriguez opined that individuals target blue collection boxes, which may contain checks that can be washed, forged, and cashed.  (ER 304.)

Marco Contreras testified as a cooperating witness regarding the events of February 15 and 16.  (ER 330.)  He admitted to having prior convictions for passing false checks and identity theft, and to having given false names to law enforcement on multiple occasions, including in this case.  (ER 330-331.)  He denied ever having lied under oath.  (ER 331.)

Contreras testified that on the evening of February 15, 2019, he was at the Quality Inn in Downey with Paishon and their friend Star, who also goes by the name Brit Moore.[7]  (ER 331-332, 362.)  At some point, he and Paishon left in Star's car to buy drugs at a friend's home in Arcadia.  (ER 332-333.)  Contreras testified that on the way to Arcadia, he and Paishon stopped to fish, or steal mail,

---

[7] The parties stipulated that Paishon's car was parked at the Quality Inn from February 15 to February 16, 2019.  (ER 426.)

from multiple boxes, with both of them using the fishing tool; after making a stop at Arcadia, they left and resumed fishing in San Gabriel because they had seen a lot of blue postal boxes in that area. (ER 333-334.) Contreras testified that he saw Officer Martinez drive by while he was carrying mail, and he thought Martinez had seen him. (ER 334.) Contreras got into the car, and Paishon drove off. (ER 335.)

Contreras testified that he and Paishon saw Martinez make a U-turn to follow them. (ER 335.) According to Contreras, he and Paishon agreed to say that the mail was already in the car, which didn't belong to them, if they were pulled over. (ER 335-336.) Contreras gave this explanation to Martinez during the traffic stop. (ER 336.)

Contreras further testified that Paishon gave him the materials to make the fishing tool, and that the tool could pull out up to four pieces of mail per attempt. (ER 337.) Contreras testified that he generally hoped to obtain checks while fishing, which could be washed of the recipient's name and cashed in another name. (ER 337-338.) He testified that he had stolen mail out of collection boxes with Paishon more than five times since the previous October. (ER 338.) He testified that they had washed checks together and split the proceeds, and that Paishon knew that he'd been in trouble for stealing mail before. (ER 338-339.)

On cross-examination, Contreras confirmed that he had been convicted of felony attempted mail theft and possession of stolen mail in federal court in May

21

2012, in a case that did not involve Paishon.  (ER 339-340, 344.)  He testified that he knew how to wash, forge, and cash stolen checks.  (ER 340.)  In January 2010, Contreras admitted to two postal inspectors that he had been using fishing devices to steal mail from mailboxes outside a post office; since then, he had been stealing mail and cashing forged checks and gone to jail many times as a result.  (ER 342-344.)  In addition to the federal felony mail theft conviction, Contreras had been convicted of forgery three times, grand theft, identity theft twice, and passing a fraudulent check — amounting to five felony convictions and several misdemeanors in the past ten years.  (ER 344-346.)

Contreras had previously cooperated in the hopes of receiving benefits at sentencing.  (ER 347.)  In January 2010, he provided information about other individuals involved in mail theft while detained for attempting to steal mail and was never charged with a crime as a result of his cooperation.  (ER 354.)  Contreras decided to cooperate in this case after learning that he could receive a sentence of five years in prison for the charged offense, and that cooperation could be considered in imposing a sentence below the Sentencing Guidelines range.  (ER 354-356.)  He had a signed a plea agreement, and he understood that the prosecutors would recommend a reduced sentence if he provided substantial assistance, which he understood to mean that his testimony was helpful to them.  (ER 357-359.)  Contreras had not been charged with any crimes relating to his

22

admission about prior mail thefts and check washing with Paishon, and the government had promised not to use those statements against him, in this or any other proceeding. (ER 360-361.)

On cross-examination, Contreras also admitted having lied to a police officer many times before, including having given various false names and birthdates. (ER 364, 366, 369-372.) Contreras repeatedly gave the false name of Charlie Zavala to Officer Martinez in this case. (ER 370-372.)

On redirect and recross, Contreras indicated that his only obligation was to tell that truth, and that he understood that the judge would determine his sentence; he recognized, however, that both his attorney and the government would recommend what that sentence should be. (ER 376-377.)

Postal inspector Kimberly Granger served as the case agent. (ER 391.) This case involved approximately 44 pieces of mail, none of which was sent to or from Paishon or Contreras. (ER 393, 395.) In the course of her investigation, which involved speaking to the senders of the mail, Granger came to investigate the area where Officer Martinez saw Contreras and Paishon — the intersection of Las Tunas Drive and Alabama Street in San Gabriel. (ER 395-398.) There are six U.S. mail collection boxes in the vicinity of that intersection. (ER 398-401.) Using a map, Granger identified three mailboxes nearby: the one used by Kent Luk of Oriental Air Logistics, the one used by Poch Blanco of Med Quick pharmacy, and

23

the one from which Contreras had been running when spotted by Officer Martinez. (ER 402-403.)

Granger spoke to Paishon on May 17, 2019. (ER 403.) Paishon told Granger that she and Contreras had been friends for years, that the car belonged to her friend Star, and that she and Contreras had been headed to Azusa to buy drugs. (ER 404-405.) According to Granger, Paishon further stated that while they were driving to Azusa, Contreras asked her to pull over, left the vehicle, returned with mail and a fishing line, and left the mail in the car; Contreras left again, returned, and they drove off before being stopped by police. (ER 405-406.) Granger did not interview Star or the friend in Azusa, nor did she investigate the additional incidences of mail theft Contreras had discussed during his proffer session. (ER 415-417.) Granger had tried to contact Star the week before trial, but she learned that Star had an active arrest warrant, and Star's phone number was not in service. (ER 423, 425.)

According to Granger, the Postal Inspection Service uses fingerprint and DNA analysis, typically in cases involving 500 or more pieces of mail, but the evidence in this case was not sent for fingerprint analysis or DNA testing. (AER 390-391, 421.) Granger testified that the sticky substance on the mail would interfere with fingerprint analysis, and that the lab had a two-year backlog for such testing. (ER 422.)

In closing, the government argued that Paishon "was a part of this plan to steal mail every step of the way." (ER 430.) Citing Contreras's testimony, the government argued that Paishon had helped make the fishing tool. (ER 430.) The government reasoned that Contreras would have carried the sticky tool out in the open, and that it would have been visible in the car. (ER 431.) The government also pointed to the amount of mail (44 pieces), originating from several different mailboxes, as evidence of multiple fishing trips over an extended period of time. (ER 434-435.)

The government argued that Paishon was guilty both as a principal and as an aider and abettor. (ER 434-439) As a principal, the government argued that it had proven that the mail was stolen, that Paishon knew it was stolen, and that Paishon possessed the mail. (ER 437-439.) The government argued — without support in the record — that Paishon knew the mail was stolen because she saw Contreras get out of the car with a fishing tool, take mail, bring the mail back to the car, and leave and return with mail a second time.[8] (ER 434-435.)

---

[8] The government relied on Paishon's statements to postal inspector Granger and Officer Martinez's testimony for these points. (ER 434-435.) However, neither Granger nor Martinez testified that Paishon admitted to seeing Contreras leave the car with the fishing tool the first time or engage in the act of stealing mail, as the closing argument suggested. (ER 243-246, 405-406.) Nor do the dashcam excerpts support this assertion. (Govt. Ex. 6, 10:40-11:05 [ER 88-89], Govt Ex. 7, 26:50-27:09 [ER 98-99], Govt. Ex. 8, 27:44-28:20 [ER 100-101], Govt. Ex. 9, 33:48-34:00 [ER 103], Govt. Ex. 10, 1:00:47-1:02:21 [ER 109-111].)

The government also relied on Paishon's pre-*Miranda* statements from the back of the patrol car to corroborate Contreras's version of events and prove Paishon's guilty knowledge.

> And when asked by Officer Martinez about the mail, she lied. She told him that the mail was already in the car and that they borrowed the car from a friend. She wasn't confused or pressured. She and Marco Contreras made up this lie before they were even pulled over. They decided they would say, as Marco Contreras . . . told you, that they borrowed the car from a friend and the mail was already in the car. And they both independently told Officer Martinez that.
>
> You heard the recordings of those statements, and they are not disputed. She didn't lie because she was confused. She lied about the mail because she knew it was stolen, and she knew she would get in trouble for having it.

(ER 435.)

As for the possession as a principal, the government argued that the presence of the mail in a car driven by Paishon sufficiently proved that element, and pointed out that Paishon was alone with some mail while Contreras engaged in an additional fishing attempt. (ER 436.)

The government's theory of Paishon's guilt as an aider and abettor also rested heavily on Contreras's testimony. The prosecutor argued that Martinez's and Contreras's testimony established that someone (Contreras) has possessed stolen mail. (ER 437.) For the crucial elements of Paishon's assistance and intent to assist, the prosecutor against pointed to Contreras's testimony. (ER 437

["Marco Contreras told you that she took turns fishing for mail herself. That's helping."], 438 ["She intended to help with this crime because she knew what was going on every step of the way. Marco Contreras told you . . . ."].) The government also argued that the witness testimony and physical evidence indicated fishing from multiple collection boxes. (ER 438.)

The prosecutor also argued that Paishon's statement to Postal Inspector Granger was sufficient to establish her knowledge of "what Contreras was doing" and intent to assist. (ER 438.) After Contreras returned to the car with stolen mail and a fishing tool, the government argued, Paishon "waited for him to do it again and then drove away." (ER 438.)

With respect to the timing of Paishon's assistance prior to the completion of the offense, the government relied on Contreras's version of events, albeit without mentioning him by name. The prosecutor stated, "All of the things I just mentioned happened before the crime was completed: Supplying the materials for the fishing tool, driving him around, driving Contreras around some more after he had already gotten mail, and getting mail herself." (ER 439.)

In Paishon's closing, she focused on the government's theory of guilt by association with Contreras. (ER 440.) The government's case rested, Paishon argued, on the word of Contreras, an individual with a history of stealing mail and lying to law enforcement, who was motivated to lie here to obtain a lower

27

sentence.  (ER 440-441, 451-453.)  Paishon argued that the government had failed to prove her possession of the mail as a principal.  (ER 443.)

As for aiding and abetting, Paishon argued that the government had failed to prove beyond a reasonable doubt her advance knowledge of the stolen-mail offense at a time when there was still a realistic opportunity for her to withdraw.  (ER 444-449.)  The fact that Paishon and Contreras both initially lied about the provenance of the mail in the car was not evidence of their partnership in mail theft, but rather a panicked response to being pulled over shortly after Contreras returned to the car with stolen mail.  (ER 449-450.)  Contreras's testimony was not corroborated by other witnesses or forensic evidence linking Paishon to the mail or fishing device. (ER 454-455.)

In rebuttal, the government argued that Paishon's statements to Granger about Contreras returning to the car with stolen mail and a fishing line, then leaving again and returning with more stolen mail, were sufficient to prove her guilt.  (ER 456-457.)  The government cited Contreras' testimony as "corroboration" of this narrative.  (ER 457.)   It compared the video clip of Paishon stating that the mail was already in the car with Contreras's testimony that they agreed to tell Officer Martinez this same story as he approached the car.  (ER 457.) The government then canvassed specific elements of Contreras's testimony, beginning with the borrowing of the car at the Quality Inn, Paishon's supplying of

the materials to make the fishing tool, his claimed history of fishing for mail and cashing fraudulent checks with Paishon, and their close relationship over a period when Contreras was engaging in mail and identity theft.  (ER 457-459.)  Yet it concluded by arguing to the jury that Contreras's testimony "simply corroborates what we already know without him" and "gives you the complete picture of what happened[.]"  (ER 460.)

The jury convicted Paishon of possession of stolen mail.  (ER 502-503.)

## E.    Sentencing

At the sentencing held on January 13, 2020, the district court sentenced Paishon to 27 months of imprisonment — at the midpoint of the 24-to-30 month advisory Sentencing Guidelines range — to be followed by three years of supervised release.  (ER 41, 45)

The district court also ordered $9,104.23 in restitution to a pharmacy that had incurred losses from medications in the stolen mail that could not be reused. (ER 46, 530.)  Paishon was held jointly and severally liable for the restitution with cooperating co-defendant Contreras, who had been sentenced to 18 months of imprisonment in a separate hearing.  (ER 47, 511.)

Relevant to this appeal, the district court informed the parties that it intended to impose a number of special conditions of supervised release, including the following:

> Defendant shall not obtain or possess any driver's license, social security number, passport, or any other form of identification in any name other than the defendant's true legal name, nor should the defendant use any name other than his true legal name without the prior written approval of the probation officer.

(ER 13.)  Defense counsel asked for an exception for Paishon to "use the name Nadine, which is what she goes by" and how she is "known."  (ER 15.)  The district court overruled the objection, stating, "if she wants to legally change her name, that's fine."  (ER 15.)

A substantially identical condition appeared as Special Condition 9 in the written judgment.  (ER 53.)

> 9.  The defendant shall not obtain or possess any driver's license, Social Security number, birth certificate, passport, or any other form of identification in any name, other than the defendant's true legal name, nor shall the defendant use, any name other than his true legal name, without the prior written approval of the Probation Officer.

At sentencing, the district court also ordered Paishon to comply with the Central District of California's General Order 18-10.[9]  (ER 47.)  Paishon did not object to this condition.  (ER 11-18.)  General Order 18-10 sets forth "standard" conditions of supervised release, including the following:

---

[9] United States District Court, Central District of California, General Order 18-10, https://www.cacd.uscourts.gov/sites/default/files/general-orders/GO%2018-10.pdf (Nov. 2, 2018).

> 14.  As directed by the probation officer, the defendant must notify specific persons and organizations of specific risks posed by the defendant to those persons and organizations and must permit the probation officer to confirm the defendant's compliance with such requirement and to make such notifications.

This condition appears as Standard Condition 14 on Paishon's written judgment. (ER 55.)  Two other provisions of the written judgment also order Paishon to comply with General Order 18-10.  (ER 52, 54.)

This timely appeal followed.  (ER 544.)

## VI.  SUMMARY OF ARGUMENT

This Court should reverse the district court's denial of Paishon's motion to suppress the statements she made while handcuffed in the back of a patrol car, before being given *Miranda* warnings (the "pre-*Miranda*" statements).  This Court's decision in *Henley* establishes that a defendant who is handcuffed and placed in a police vehicle is sufficiently restrained in her freedom of movement to be "in custody" for *Miranda* purposes, even if she is told that she is not under arrest.  Additional factors demonstrate that Paishon was in custody: she was told she was being "detained," isolated from her companion in the middle of the night, not released at the end of the questioning, and confronted with evidence of guilt in an aggressive and deceptive way.  That the actual questioning was brief and Paishon was told she was being handcuffed for officer safety did not dissipate these inherently coercive circumstances.

31

The government cannot show that this *Miranda* error was harmless beyond a reasonable doubt. Paishon's unwarned statement that the mail was already in the car showed consciousness of guilt and was inconsistent with later statements she made about Contreras bringing the mail to the car. Even more important, the statement provided critical support for Contreras's testimony, which was otherwise heavily impeached and lightly corroborated. As a cooperating witness with a history of felony mail theft and lying to law enforcement, Contreras had serious credibility issues. Corroboration for his testimony that he and Paishon had agreed to lie and tell Martinez that the mail was already in the car bolstered his overall credibility, as well as his narrative of Paishon as an equal partner-in-crime.

This Court should vacate and remand two conditions of supervised release. Special Condition 9 prevents Paishon, a transgender woman, from using the first name "Nadine" socially without prior written approval of the probation officer. This condition does not promote deterrence, protection, or rehabilitation and deprives Paishon of more liberty than is reasonably necessary to achieve the goals of sentencing. The district court gave no individualized reason for imposing the condition, which unreasonably infringes on Paishon's liberty interest, grounded in the fundamental right to privacy, to use her preferred first name in social situations. Standard Condition 14 is a condition regarding notification of "specific risks" that this Court has recently held is unconstitutionally vague.

## VII. ARGUMENT

**A.** **The District Court Erred in Denying Paishon's Motion to Suppress the Unwarned Statements She Made While Handcuffed in the Back of a Police Car.**

### Standard of Review

Whether a person is "in custody" for purposes of *Miranda* is a mixed question of law and fact that is reviewed de novo. *United States v. Cazares*, 788 F.3d 956, 979 (9th Cir. 2015).

### Discussion

### 1.   This Court's Decision in *Henley* Is Controlling on the Custody Question.

The Fifth Amendment provides that "no person . . . shall be compelled in any criminal case to be a witness against himself[.]" U.S. Const., amend. V. The Fifth Amendment privilege "is available outside of criminal court proceedings and serves to protect persons in all settings in which their freedom of action is curtailed in any significant way from being compelled to incriminate themselves." *Miranda v. Arizona*, 384 U.S. 436, 467 (1966). In *Miranda*, the Supreme Court held that "the prosecution may not use statements, whether exculpatory or inculpatory, stemming from custodial interrogation of the defendant unless it demonstrates the use of procedural safeguards effective to secure the privilege against self-incrimination." *Id.* at 444. Those procedural safeguards consist of the familiar *Miranda* warnings — "that he has the right to remain silent, that anything he says

33

can be used against him in a court of law, that he has the right to the presence of an attorney, and that if he cannot afford an attorney one will be appointed for him prior to any questioning if he so desires," *id.* at 479 — that "have become part of our national culture," *Dickerson v. United States*, 530 U.S. 428, 443 (2000).

*Miranda* warnings must be given when a person is "subjected to custodial interrogation." *Berkemer v. McCarty*, 468 U.S. 420, 434 (1984). The custody inquiry turns on "whether a reasonable person in the circumstances would have believed he could freely walk away from the interrogators." *United States v. Barnes*, 713 F.3d 1200, 1204 (9th Cir. 2013). This Court has clearly held that the circumstances here — questioning of a handcuffed defendant who was seated in the back of a police car — constitute custodial interrogation. In *Henley*, this Court held that the custody status of a defendant who had "not been formally arrested" but "was handcuffed and placed in the back seat of a squad car" was "easily resolved." *Henley*, 984 F.2d at 1042. This Court reasoned, "It is fair to say that someone who is being questioned by an FBI agent while sitting handcuffed in the back of a police car is, indeed, not free to leave. We have no trouble concluding that Henley 'ha[d] been taken into custody or otherwise deprived of his freedom of action in [a] significant way.'" *Id.* (citing *Miranda*, 384 U.S. at 444). As in *Henley*, Paishon was handcuffed and "put" in the back of a squad car. (Ex. A at 11:05-12:09; ER 89-90.) A reasonable person in that situation in the middle of the

night would not have felt free to leave, and would have acted as Paishon did, remaining where she had been placed and calling out to other officers when she wished to speak to Officer Martinez.

The district court thus erred in denying the motion to suppress with respect to the "pre-*Miranda*" statements Paishon made while in the back of the police car. In denying the motion to suppress, the district court — without specifically addressing *Henley* — relied on three facts: that Paishon was told several times that she was not under arrest, that she was told she was being handcuffed for officer safety, and that the questioning was short in duration. But none of these circumstances changes the in-custody analysis.

The fact that Paishon was told she was not under arrest does not meaningfully distinguish *Henley*, where the defendant "was told he was not under arrest" but "testified that he did not feel free to leave." *Henley*, 984 F.2d at 1042. Paishon, likewise, submitted a declaration stating that she did not feel free to leave. (ER 81.) The district court also failed to mention that Paishon was twice told that she was being "detain[ed]" (ER 89-90), which in common parlance means "to hold or keep in or as if in custody." *See* "Detain," *Merriam-Webster Dictionary*, https://www.merriam-webster.com/dictionary/detain (last visited July 17, 2020). A reasonable layperson, "detained" by the police in a patrol car with her hands cuffed

35

behind her back, after being ordered out of a car bearing an expired registration tag and containing stolen mail, would understand that she was not free to leave.

Further, that Paishon was told that she was being handcuffed to ensure officer safety does not alter a reasonable person's understanding that she was being subject to arrest-like restraints. Martinez gave no indication that this handcuffing was intended to be a temporary or brief prelude to allowing Paishon to leave the scene. Significantly, in *United States v. Newton*, 369 F.3d 659 (2d Cir. 2004), the Second Circuit cited *Henley* in support of its conclusion that the handcuffing of a defendant overrode any assurances that he was not under arrest, as well as any safety reasons given for the handcuffing:

> We do not overlook the fact that Newton was specifically advised that he was *not* being placed under arrest and that the restraints were being employed simply to ensure his own safety and that of the officers. But telling a suspect that he is not under arrest does not carry the same weight in determining custody when he is in handcuffs as it does when he is unrestrained.

*Newton*, 369 F.3d at 676 (citing *Henley*, 984 F.2d at 1042). This reasoning applies with even more force here, where a handcuffed Paishon was questioned in the back of a *police car* and not in her own home, as in *Newton*. *Newton*, 369 F.3d at 663 (handcuffed defendant was seated "in a chair close to the front door" of his apartment).

Finally, the district court erred by considering the brief period of questioning as a factor weighing against a finding of custody. (ER 7.) Under these circumstances, it is the "duration of the detention" that matters for the "in custody" inquiry, more than the duration of the questioning. *See Barnes*, 713 F.3d at 1204 (citing *United States v. Kim*, 292 F.3d 969, 974 (9th Cir. 2002)). Here, by the time Paishon made the statement about the mail already being in the car, the traffic stop had begun nearly a half hour earlier, and Paishon had been handcuffed in the back of the police car for more than fifteen minutes with no clear end in sight. (Ex. A at 27:03-27:06; ER 99.) *Miranda* does not admit of an exception just because a defendant's inculpatory statements were brief or occurred early on in custodial interrogation. In any event, the crime under investigation was not particularly sophisticated or complex, and did not require extensive interrogation at the scene.

The district court also disregarded other circumstances indicative of custody. Paishon was separated from her companion Contreras, in the back of a police car on a road in the middle of the night. *See Kim*, 292 F.3d at 974 (noting "coercive impact of enforced isolation"). By this point, the encounter had progressed far past the "typical traffic stop," which is "presumptively temporary and brief," and somewhat public. *See Berkemer*, 468 U.S. at 437-38. In fact, Paishon was not released after questioning and was taken to the police station instead, another factor indicative of custody. *See Howes v. Fields*, 565 U.S. 499, 509 (2012).

Paishon had also been confronted with evidence of guilt with respect to the stolen-mail offense — another pertinent factor in assessing the custody question. *See Barnes*, 713 F.3d at 1204. Martinez asked, "Okay, what's up with the mail? . . . What's up with the mail?" (Ex. A 27:01-27:03; ER 99.) He asked Paishon if she was "lying" to him and told her he had seen Contreras running and her driving. (Ex. A 27:07, 27:24, 27:27; ER 99-100.) He also lied to Paishon about the time and shut the door to the car when she stated he was lying. (Ex. A at 28:36; ER 101.) This "aggressive, coercive, and deceptive tone" weighs in favor of a finding of custody. *See United States v. Bassignani*, 575 F.3d 879, 884 (9th Cir. 2009)

As in *Henley*, the circumstances of Paishon's interrogation in the police car were as inherently coercive as the station house questioning at issue in *Miranda*. *See Howes*, 565 U.S. at 509. The district court erred by concluding otherwise, and this Court should reverse.

### 2. The Error Was Not Harmless Beyond a Reasonable Doubt.

Reversal for a new trial is required because the government cannot meet its burden to prove harmlessness beyond a reasonable doubt. "On direct review, the government's commission of a constitutional error requires reversal of a conviction unless the government proves 'beyond a reasonable doubt that the error complained of did not contribute to the verdict obtained.'" *United States v.*

38

*Williams*, 435 F.3d 1148, 1162 (9th Cir. 2006) (quoting *Chapman v. California*, 386 U.S. 18, 24 (1967)) (internal quotation marks omitted).

The government fought vigorously below to admit the pre-*Miranda* statements, played the video clip containing those statements at trial, and highlighted them in their opening statement, closing argument, and rebuttal closing argument to the jury. (ER 137-141, 218, 245, 435, 457.) Outside the presence of the jury, the government told the district court that the statements regarding the provenance of the mail were inculpatory due to their inconsistency with later statements. (ER 170, 176-177.) The false statement was also incriminating because they demonstrated a consciousness of guilt.

Moreover, the unwarned statements shored up the testimony of the government's star witness, cooperating co-defendant Marco Contreras. Contreras had serious credibility issues due to his multiple convictions for mail theft, forgery, identity theft, and passing false checks, not to mention a history of testifying against co-defendants in hopes of receiving a lighter sentence. *See United States v. Bernal-Obeso*, 989 F.2d 331, 336 (9th Cir. 1993) ("Prosecutors confront the same problem in evaluating the usefulness of an informant as a witness: a serious felony record could cause a jury completely to disregard his testimony and possibly to conclude from it that the government's entire case is suspect.") The jury was instructed that, due to his prior felony offenses and cooperation benefits in this

case, it should "examine the testimony of Marco Contreras with greater caution than that of other witnesses." (ER 487.)

Contreras's testimony was crucial to the government's case. He painted a picture of Paishon as a prime mover in the offense, characterizing her as a willing partner-in-crime who supplied the materials for making fishing tools, actively fished for mail, and washed checks obtained from the mail. The problem was, the most incriminating portions of Contreras's testimony were largely lacking in corroboration. The government did not present the testimony of the third person present at the Quality Inn while Contreras and Paishon allegedly made the fishing tool, no forensic evidence linked Paishon to the tool or mail, and Contreras was the only person seen with mail in his arms. Further, while Paishon had twenty prior convictions, primarily misdemeanors, she had no prior convictions for mail theft or check-washing.

Against this backdrop of Contreras's shaky credibility and largely uncorroborated narrative, any point of intersection between Contreras's and Paishon's statements took on extra importance. "Review for harmless error requires not only an evaluation of the remaining incriminating evidence in the record, but also the most perceptive reflections as to the probabilities of the effect of error on a reasonable trier of fact." *United States v. Garibay*, 143 F.3d 534, 539 (9th Cir. 1998). Here, by introducing evidence that Paishon had initially lied about

40

the mail already being in the car, the government was able to convey to the jury that Paishon had not only exhibited consciousness of guilt, but that Contreras had been truthful when he testified that they were working together to steal mail and decided to tell Officer Martinez a prearranged lie. (ER 218, 435, 437.) This Court has concluded that a *Miranda* violation was not harmless when the "bulk of the testimony" against a defendant was provided by a government informant, the informant's "credibility was a point of contention at trial, and it is likely that his testimony was credited in part because it was corroborated" by the defendant's unwarned statements. *See United States v. Noti*, 731 F.2d 610, 616 (9th Cir. 1984). It should do the same here.

**B.    Special Condition 9 ("True Legal Name") and Standard Condition 14 ("Special Risks") Must Be Vacated.**

### Standard of Review

A district court's decision to impose a condition of supervised release is reviewed for abuse of discretion. *United States v. Weber*, 451 F.3d 552, 557 (9th Cir. 2006).

While the Court generally reviews supervised-release conditions for abuse of discretion, it reviews de novo whether conditions violate the Constitution. *United States v. Evans*, 883 F.3d 1154, 1159-60 (9th Cir. 2018). Even though Paishon did not object to Standard Condition 14 below, the Court is not bound by the plain-error standard to the extent "the appeal presents a pure question of law and there is

41

no prejudice to the opposing party that resulted from the defendant's failure to object." *United States v. Joseph*, 716 F.3d 1273, 1276 n.4 (9th Cir. 2013) (internal quotation marks omitted). Even if the plain-error standard applies, however, the Court may still grant relief if the district court erred, that error was plain, the error affected Paishon's substantial rights, and the error seriously affects the fairness, integrity, or public reputation of judicial proceedings. *Id.* at 1277.

## Discussion

Although a sentencing judge is given significant discretion in imposing special conditions of supervised release, such discretion is "not . . . boundless." *Weber*, 451 F.3d at 557. By statute, a condition may be ordered only to the extent it (1) is reasonably related to certain factors, including (a) the nature and circumstances of the offense and the history and characteristics of the defendant, (b) the need to afford adequate deterrence, (c) the need to protect the public from further criminal conduct by the defendant, and (d) provision of educational or vocational training, medical care, or other correctional treatment in the most effective manner. *See id.* at 557-58; 18 U.S.C. §§ 3583(d), 3553(a). Any discretionary condition must also involve "no greater deprivation of liberty than is reasonably necessary" for the purposes of deterrence, protection of the public, and rehabilitation. *See* 18 U.S.C. § 3583(d)(2); *see also Weber*, 451 F.3d at 558; *United States v. Williams*, 356 F.3d 1045, 1052-53 (9th Cir. 2004). Thus, any

condition must be "properly tailored" based on the particular circumstances of the defendant in each individual case, *id.* at 1053, and it must be the least restrictive condition necessary to achieve the goals of supervision.

Moreover, although a district court may restrict fundamental rights as a condition of supervised release, such conditions are "reviewed carefully." *See United States v. Wolf Child*, 699 F.3d 1082, 1089 (9th Cir. 2012) (internal quotation marks omitted). When a condition of supervised release implicates a particularly significant liberty interest, "the district court must support its decision to impose the condition on the record with record evidence that the condition of supervised release sought to be imposed is *necessary* to accomplish one or more of the factors listed in [18 U.S.C.] § 3583(d)(1) and involves no greater deprivation of liberty than is reasonably necessary." *Id.* (emphasis in original) (internal quotation marks omitted).

### 1. The "True Legal Name" Condition (Special Condition 9)

As construed by the district court, Special Condition 9 deprives Paishon of more liberty than is reasonably necessary for deterrence, protection of the public, and rehabilitation insofar as it prevents her from using the first name "Nadine" socially without prior written approval from the probation officer. Paishon does not challenge that portion of Special Condition 9 that prohibits her from obtaining identification documents in a name other than her true legal name.

43

As a transgender woman, Paishon has a particularly significant liberty interest in going by "Nadine," a name that corresponds to her gender identity. "It is generally accepted that transgender individuals face an alarming rate of discrimination, harassment, and violence" — in school, and into adulthood and the workplace. *Crowder v. Diaz*, No. 2:17-CV-1657-TLN-DMC, 2019 WL 3892300, at *13 (E.D. Cal. Aug. 19, 2019). The record presented at sentencing in this case recounts how this history of violence and discrimination has impacted Paishon's relationships, housing and employment. (PSR 23.) Given this widespread animosity toward the transgender community, a policy that requires individuals "to disclose their transgender status . . . directly implicates their fundamental right of privacy." *See Love v. Johnson*, 146 F. Supp. 3d 848, 854-56 (E.D. Mich. 2015). *Id.* at 854-56. This right to "informational privacy" involves "the individual interest in avoiding disclosure of personal matters." *See In re Crawford*, 194 F.3d 954, 958 (9th Cir. 1999). By requiring Paishon to use the name "Todd," and by prohibiting her from using the name "Nadine" in everyday social situations, Special Condition 9 effectively requires disclosure of her transgender status.

The federal government, in the context of health care, has acknowledged transgender individuals' interest in using a preferred first name. The Centers for Disease Control and Prevention ("CDC") has recognized that transgender people have experienced stigma, discrimination, harassment, and violence, including in

healthcare settings.[10]  The CDC reports: "Given these challenges, transgender people, especially transgender women of color, may delay seeking medical care because of fear or actual experience of negative treatment by health care staff."[11] Such unpleasant encounters often start at the front desk, where discrepancies between a patient's legal name and preferred name may "put[] patients in the uncomfortable position of having to explain their transgender status to the front desk within hearing distance of other patients."[12]  According to the CDC, "[o]ne of the most important steps in creating a welcoming environment for transgender people (and all people) is to address patients using their preferred names and pronouns."[13]  The CDC also recommends that if a health care provider is "unsure about a patient's preferred name or pronouns, ask politely and privately."[14]

---

[10] Centers for Disease Control and Prevention, *Patient-Centered Care for Transgender People: Recommended Practices for Health-Care Settings*, https://www.cdc.gov/hiv/clinicians/transforming-health/health-care-providers/affirmative-care.html (last visited July 17, 2020).

[11] *Id.*

[12] *Id.*

[13] CDC, *Patient-Centered Care for Transgender People: Recommended Practices for Health-Care Settings (Patient-Centered Strategies in Health Care)*, https://www.cdc.gov/hiv/clinicians/transforming-health/health-care-providers/affirmative-care.html#strategies (last visited July 17, 2020).

[14] *Id. (Communication Strategies and Scripts—Summary of Best Practices).*

The record establishes that Paishon's interest in using the name Nadine is sincere and longstanding. It is undisputed that Paishon is a transgender woman who has used the name "Nadine" for sixteen years, since she became an adult. (PSR 55 ¶ 84.) The name "Nadine" is tattooed on her leg. (PSR 57 ¶ 98.) In the government's opening statement, the prosecutor informed the jury that Paishon "prefers to be called Nadine." (ER 216.) Cooperating witness Marco Contreras testified that he knew Paishon "as Nadine" and referred to her as "Nadine" throughout his testimony. (ER 329, 332, 333, 335, 337.)

This Court's decision in *United States v. Soltero*, 510 F.3d 858 (9th Cir. 2007) (per curiam), is not to the contrary. In *Soltero*, the district court imposed a condition of supervised release similar to Special Condition 9 here. *Id.* at 865. Soltero challenged the condition because while his true legal surname was "Resinger," he had used his stepfather's surname, "Soltero," since he was two years old. *Id.* at 865 & n.7. This Court held that the district court did not err in imposing the condition because "[n]o authority vests with the federal courts to grant a name change. If the defendant wishes to legally change his name under California law, he must follow the procedures allowed under state law." *Id.* at 865.

This Court clarified that *Soltero* does not apply to a *first* name that a defendant uses socially in *United States v. Ortiz*, 735 F. App'x 419 (9th Cir. 2018) (unpublished). In *Ortiz*, the same district court imposed the same "true legal

46

name" condition that is at issue here.[15]  The defendant, Jose Ortiz, argued that the condition would prevent him from using the name "Joseph," "the English version of his true name 'Jose.'"  *Id.* at 420.  This Court affirmed the condition, explaining that Ortiz had misconstrued its scope:

> Special condition seven simply prohibits the appellant from obtaining or possessing a "driver's license, social security number, birth certificate, passport or any other form of identification in any name, other than the [appellant's] true name."  It does not prevent Ortiz or his friends from referring to him/himself as "Joseph."  Clearly, the district court's order sets parameters designed to curb criminal conduct on the part of Ortiz through documents in a name other than his legal name.

*Id.*  The decision in *Ortiz* accords with common sense.  A defendant should not be put in violation of his supervised release for going by a nickname— such as "Andy," "A.J.," or "Junior" for "Andrew Smith, Jr." — without some evidence that use of the nickname somehow undermines deterrence, protection of the public, or rehabilitation.

Here, however, the district court appeared to disavow the limiting construction this Court pronounced in *Ortiz*.  Further, the district court infringed Paishon's significant liberty interest in use of the name "Nadine" without citing the

---

[15] While the *Ortiz* memorandum disposition does not reproduce the condition in full, the parties' briefing makes clear that the condition was identical to the one imposed here.  *See* Appellant's Opening Brief, 2017 WL 4077702, at *4; Government's Answering Brief, 2017 WL 6448145, at *4.

requisite record evidence that the condition was "*necessary*" to accomplish deterrence, protection of the public, or rehabilitation. *See Wolf Child*, 699 F.3d at 1089. It gave no individualized reason whatsoever for imposing the condition, stating only that it was "fine" for Paishon to "to legally change her name." (ER 15.) And there is no indication that Paishon's use of the name "Nadine" has promoted or facilitated her criminal conduct or otherwise poses an obstacle to her rehabilitation. (PSR 43-49.) On the other hand, the record indicates that preventing Paishon from using her preferred name may impede her ability to receive substance abuse, mental health, and medical treatment in the most effective manner. These concerns are not merely theoretical for Paishon, who suffers from a serious chronic condition (PSR 20, 57 ¶ 101); she also must participate in substance abuse and mental health treatment as conditions of her supervised release. (ER 52-53.)

Even if Paishon's interest in using her preferred first name socially does not rise to the level of a particularly significant liberty interest, it involves a greater deprivation of liberty than is reasonably necessary to serve the purposes of deterrence, protection of the public, and rehabilitation. Because the condition does not promote deterrence, protection of the public, or rehabilitation at all, any infringement on Paishon's ability to refer to herself in a way that accords with her

gender identity — in social situations, not on legal forms of identification —is greater than necessary.

Finally, Section 3583(d)(3) requires that a special condition of supervised release be "consistent with pertinent policy statements issued by the Sentencing Commission pursuant to 28 U.S.C. § 994(a)." 18 U.S.C. § 3583(d)(3). Special Condition 9 is not among the "standard," "special," or "additional" conditions of supervised release recommended by the Sentencing Guidelines. *See* U.S.S.G. § 5D1.3(c)-(e).

Special Condition 9, as applied to Paishon's use of the name "Nadine," does not satisfy the requirements of Section 3583(d) and this Court's caselaw. Therefore, this Court should vacate that portion of Special Condition 9 that precludes "use" of "any name other than [her] true legal name without the prior written approval of the probation officer" (ER 53), and remand for the district court to craft a properly tailored condition. *See United States v. Ped*, 943 F.3d 427, 434 (9th Cir. 2019).

### 2. The "Specific Risks" Condition (Standard Condition 14)

In *United States v. Magdirila*, 962 F.3d 1152, 2020 WL 3424930 (9th Cir. June 23, 2020), this Court vacated and remanded Standard Condition 14 — the same "specific risks" condition imposed on Paishon here. *Id.* at *5. This Court explained that it had struck down as unconstitutionally vague a prior, "nearly

49

identical" version of this condition in *United States v. Evans*, 883 F.3d 1154, 1163 (9th Cir. 2018), "in part because it failed to answer the question of *what* conduct the defendant needed to warn the public about." *Magdirila*, 2020 WL 3424930, at *5. Further, "[t]he revised language in Standard Condition 14 does not cure this deficiency." *Id.* It therefore remanded for the district court "to craft a supervised release condition that accords with [the defendant's] criminal history." *Id.*

Here, the district court did not have the benefit of *Magdirila* at the time it sentenced Paishon. Nevertheless, because the district court in this case imposed the same supervised-release condition found to be unconstitutional in *Magdirila*, the Court should do what it did there: remand for the district court to correct the condition. *Magdirila*, 2020 WL 3424930, at *5. Paishon's failure to object below does not prevent her from obtaining this relief.

The Court is not bound by the plain-error standard where "the appeal presents a pure question of law and there is no prejudice to the opposing party that resulted from the defendant's failure to object." *Joseph*, 716 F.3d at 1276 n.4 (internal quotation marks omitted). Here, the unconstitutionality of Standard Condition 14 involves a pure question of law that has already been resolved in *Magdirila.* There is no prejudice to the government from Paishon's failure to object.

50

In any event, Paishon can satisfy the plain-error standard because the district court erred, that error was plain, the error affected Paishon's substantial rights, and the error seriously affects the fairness, integrity, or public reputation of judicial proceedings. *Joseph*, 716 F.3d at 1277. In light of *Magdirila*, the district court erred in imposing Standard Condition 14, and that error is plain. *See Henderson v. United State*s, 568 U.S. 266, 279 (2013) (error must be plain at time of appellate review). And this error affects Paishon's substantial rights and seriously affects the fairness, integrity, or public reputation of judicial proceedings. *See United States v. LaCoste*, 821 F.3d 1187, 1192 (9th Cir. 2016) (third and fourth prongs of plain-error standard satisfied where Internet-use restriction could not lawfully be imposed); *United States v. Barsumyan*, 517 F.3d 1154, 1161-62 (9th Cir. 2008) (third and fourth prongs of plain-error standard satisfied where condition prohibiting defendant from accessing or possessing any computer or computer-related devices was improper); *United States v. Abbouchi*, 502 F.3d 850, 858 (9th Cir. 2007) (third and fourth prongs of plain-error standard satisfied where evidence was insufficient to support domestic-violence-treatment condition). Indeed, this Court has held that imposition of the prior version of Standard Condition 14 constituted plain error. *Ped*, 943 F.3d at 433.

This Court has recognized that "there is little reason not to correct plain sentencing errors when doing so is so simple a task. Reversing a sentence does not

51

require that a defendant be released or retried, but simply allows a district court to exercise properly its authority to impose a legally appropriate sentence." *Joseph*, 716 F.3d at 1281 (internal quotation marks omitted). Under the circumstances, a remand for the district court to correct the unconstitutional conditions is necessary and appropriate. *See Ped*, 943 F.3d at 433-34.

## VIII. CONCLUSION

For the foregoing reasons, this Court should reverse the district court's denial of Paishon's suppression motion and remand for further proceedings.

In the event this Court does not reverse the district court's denial of the suppression motion, it should vacate Special Condition 9 and Standard Condition 14 and remand to the district court. Because Standard Condition 14 is included in General Order 18-10, this Court should also vacate the judgment's two references to complying with General Order 18-10. (ER 52, 54.)

Respectfully submitted,

CUAUHTEMOC ORTEGA
Interim Federal Public Defender

DATED: July 17, 2020          By *s/ Gia Kim*
GIA KIM
Deputy Federal Public Defender
Attorney for Defendant-Appellant

## CERTIFICATE OF RELATED CASES

Counsel for appellant certifies that she is unaware of any pending case presenting an issue related to those raised in this brief.

DATED:  July 17, 2020                    *s/ Gia Kim*
                                          GIA KIM

## CERTIFICATE OF COMPLIANCE

Pursuant to Fed. R. App. 32(a)(7)(C) and Circuit Rule 32-1, I certify that this reply brief is proportionally spaced, has a typeface of 14 points or more, and contains approximately 12,360 words.

DATED:  July 17, 2020                                   *s/ Gia Kim*
                                                        GIA KIM