No. 20-50008

# IN THE UNITED STATES COURT OF APPEALS
# FOR THE NINTH CIRCUIT

UNITED STATES OF AMERICA,
*Plaintiff-Appellee,*

*v.*

TODD KAMAWU PAISHON,
*Defendant-Appellant.*

*APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE CENTRAL DISTRICT OF CALIFORNIA
DISTRICT COURT NO. CR 19-304-PA-2*

## GOVERNMENT'S ANSWERING BRIEF

NICOLA T. HANNA
United States Attorney

L. ASHLEY AULL
Assistant United States Attorney
Chief, Criminal Appeals Section

JENNA WILLIAMS
PATRICK CASTAÑEDA
Assistant United States Attorneys
General Crimes Section

1200 United States Courthouse
312 North Spring Street
Los Angeles, CA 90012
Telephone: (213) 894-2690
Email: jenna.williams@usdoj.gov

Attorneys for Plaintiff-Appellee
UNITED STATES OF AMERICA

# TABLE OF CONTENTS

**DESCRIPTION**                                                   **PAGE**

I.    INTRODUCTION .................................................................1

II.   ISSUES PRESENTED ........................................................5

III.  STATEMENT OF THE CASE .............................................6

    A.  Jurisdiction, Timeliness, and Bail Status ...............................6

    B.  Statement of Facts and Procedural History ..........................7

        1.  The Traffic Stop and Defendant's Statements ..............7

        2.  Indictment ..................................................................13

        3.  Denial of Defendant's Motion to Suppress .................13

        4.  Trial ...........................................................................15

        5.  Conviction ..................................................................31

        6.  Sentencing ..................................................................31

IV.   SUMMARY OF ARGUMENT ...........................................32

V.    ARGUMENT ...................................................................35

    A.  The District Court Properly Denied Defendant's Motion
        to Suppress the Pre-*Miranda* Statements Because
        Defendant Was Not in Custody When She Made Them ......35

        1.  Standard of Review .....................................................35

        2.  Legal Framework ........................................................35

        3.  Defendant Was Not In Custody When She Made
        the Pre-*Miranda* Statements to Officer Martinez.......37

# TABLE OF CONTENTS (continued)

**DESCRIPTION**                                                    **PAGE**

B.   Even If the Admission of Defendant's Statements Was In Error, their Admission Was Harmless Beyond a Reasonable Doubt ................................................................ 50

    1.   Legal Standard ............................................................. 50

    2.   Overwhelming Evidence, Independent of the Pre-Miranda Statements, Proves Defendant's Guilt ......... 51

    3.   This Court Has Often Found Harmless the Type of Statement at Issue: A Limited False Exculpatory Statement ................................................. 60

    4.   The Brevity of the Jury's Deliberations Underscore that Any Error Was Harmless ................. 62

    5.   Any Marginal Additional Corroboration of Contreras's Testimony Was Likewise Harmless ........ 63

C.   This Court Should Remand to the District Court for the Limited Purpose of Amending Special Condition 9 and Correcting Standard Condition 14 ....................................... 70

    1.   Standard of Review ....................................................... 70

    2.   Legal Framework .......................................................... 70

    3.   This Court Should Remand to the District Court for the Limited Purpose of Amending Special Condition 9 ................................................................. 71

    4.   This Court Should Remand for the District Court to Correct Standard Condition 14 ............................... 72

VI.   CONCLUSION ................................................................. 73

# TABLE OF AUTHORITIES

**DESCRIPTION**                                                    **PAGE(S)**

## Federal Cases

*Miranda v. Arizona,*
384 U.S. 436 (1966) ................................................................ 49

*Arizona v. Johnson,*
555 U.S. 323 (2009) .............................................................. 43

*Berkemer v. McCarty,*
468 U.S. 420 (1984) ...................................................... 35, 37, 40

*Chapman v. California,*
386 U.S. 18 (1967) ................................................................ 50

*Howes v. Fields,*
565 U.S. 499 (2012) ....................................................... passim

*Maryland v. Shatzer,*
559 U.S. 98 (2010) ................................................................ 49

*Melendez-Diaz v. Massachusetts,*
557 U.S. 305 (2009) .............................................................. 39

*Stansbury v. California,*
511 U.S. 318 (1994) ........................................................ 36, 37

*United States v. Arreguin,*
735 F.3d 1168 (9th Cir. 2013) ............................................. 35

*United States v. Bassignani,*
575 F.3d 879 (9th Cir. 2009) ...................................... 36, 42, 46

*United States v. Bautista,*
684 F.2d 1286 (9th Cir. 1982) ........................................ passim

# TABLE OF AUTHORITIES (continued)

**DESCRIPTION**                                            **PAGE(S)**

*United States v. Beraun-Panez,*
812 F.2d 578 (9th Cir.)......................................................47

*United States v. Bernal-Obeso,*
989 F.2d 331 (9th Cir. 1993)........................................68, 69

*United States v. Booth,*
669 F.2d 1231 (9th Cir. 1981).....................................32, 38

*United States v. Bravo,*
295 F.3d 1002 (9th Cir. 2002)...........................................41

*United States v. Bushyhead,*
270 F.3d 905 (9th Cir. 2001)..............................................58

*United States v. Butler,*
249 F.3d 1094 (9th Cir. 2001)......................................55, 59

*United States v. Caruto,*
532 F.3d 822 (9th Cir. 2008)..............................................62

*United States v. Cervantes–Flores,*
421 F.3d 825 (9th Cir. 2005)..............................................39

*United States v. Crawford,*
372 F.3d 1048 (9th Cir. 2004).............................................42

*United States v. Fornia–Castillo,*
408 F.3d 52 (1st Cir. 2005) .........................................39, 45

*United States v. Garibay,*
143 F.3d 534 (9th Cir. 1998)........................................61, 62

*United States v. Harrison,*
34 F.3d 886 (9th Cir. 1994)...............................................60

iv

# TABLE OF AUTHORITIES (continued)

**DESCRIPTION**                                       **PAGE(S)**

*United States v. Henley,*
984 F.2d 1040 (9th Cir. 1993)........................................................42, 43

*United States v. Hudgens,*
798 F.2d 1234 (9th Cir. 1986)..............................................................38

*United States v. Khan,*
993 F.2d 1368 (9th Cir. 1993)..............................................................61

*United States v. Kim,*
292 F.3d 969 (9th Cir. 2002)................................................................45

*United States v. Lee,*
699 F.2d 466 (9th Cir. 1982)................................................................45

*United States v. Leshuk,*
65 F.3d 1105 (4th Cir. 1995)................................................................38

*United States v. Lopez,*
500 F.3d 840 (9th Cir. 2007)..........................................................55, 63

*United States v. Magdirila,*
962 F.3d 1152 (9th Cir. 2020)............................................6, 35, 72, 73

*United States v. Martinez,*
239 Fed. App'x 355 (9th Cir. 2007).....................................................58

*United States v. Murray,*
89 F.3d 459 (7th Cir. 1996).................................................................39

*United States v. Napulou,*
593 F.3d 1041 (9th Cir. 2010)........................................................71, 72

# TABLE OF AUTHORITIES (continued)

**DESCRIPTION**            **PAGE(S)**

*United States v. Newton,*
    369 F.3d 659 (2d Cir. 2004) ..................................... 41, 43, 44

*United States v. Norris,*
    428 F.3d 907 (9th Cir. 2005) ............................................. 48

*United States v. Noti,*
    731 F.2d 610 (9th Cir. 1984) .............................. 33, 51, 67, 68

*United States v. Ped,*
    943 F. 3d 427 (9th Cir. 2019) ........................................... 72

*United States v. Pino-Noriega,*
    189 F.3d 1089 (9th Cir. 1999) ......................................... 63

*United States v. Richards,*
    500 F.2d 1025 (9th Cir. 1974) ......................................... 46

*United States v. Velarde-Gomez,*
    269 F.3d 1023 (9th Cir. 2001) ..................................... 58, 62

*United States v. Wauneka,*
    770 F.2d 1434 (9th Cir. 1985) ..................................... 47, 48

*United States v. Weber,*
    451 F.3d 552 (9th Cir. 2006) ........................................... 70

*United States v. Williams,*
    435 F.3d 1148 (9th Cir. 2006) ........................... 50, 51, 60, 61

**Federal Statutes**

18 U.S.C. § 3231 ............................................................... 6

18 U.S.C. § 3583(d) ......................................................... 70

# TABLE OF AUTHORITIES (continued)

**DESCRIPTION**                                              **PAGE(S)**

18 U.S.C. § 3742 .............................................................................. 6

18 U.S.C. § 1708 ............................................................................ 13

28 U.S.C. § 1291 .............................................................................. 6

**Federal Rules**

Fed. R. App. P. 4(b)(1)(A)(i) ......................................................... 6

No. 20-50008

# IN THE UNITED STATES COURT OF APPEALS
# FOR THE NINTH CIRCUIT

UNITED STATES OF AMERICA,

*Plaintiff-Appellee,*

*v.*

TODD KAMAWU PAISHON,

*Defendant-Appellant.*

*APPEAL FROM THE UNITED STATES DISTRICT COURT*
*FOR THE CENTRAL DISTRICT OF CALIFORNIA*
*DISTRICT COURT NO. CR 19-304-PA-2*

## GOVERNMENT'S ANSWERING BRIEF

# I

# INTRODUCTION

It was just after 3:00 a.m. when a San Gabriel Police Department officer on routine patrol saw a car parked on the side of the road with its lights on. The driver, Todd Kamawu Paishon ("defendant"), was waiting inside. The officer then saw a man, Marco Contreras ("Contreras"), run toward the car with envelopes in his arms. Contreras

jumped into the passenger seat, and defendant immediately drove away.

Suspecting that Contreras had burglarized a local business, and noticing that defendant's car had expired registration, the officer pulled defendant over to investigate. The officer soon learned that the car did not belong to either defendant or Contreras, and that defendant's driver license was suspended. On the passenger floorboard, the officer saw a pile of mail and a "fishing" tool, used to steal mail from United States Postal Service ("USPS") collection boxes.

During the stop, the officer investigated a host of potential crimes, including mail theft, car theft, identity theft, burglary, driving with expired registration, and driving without a license. As part of that investigation, the officer detained and questioned defendant and Contreras, both of whom repeatedly lied about their criminal activities. For example, defendant made several false exculpatory statements denying her involvement in the mail theft, including the statement at the heart of this appeal: that the stolen mail was already in defendant's car when she borrowed the car from her friend. At the traffic stop's conclusion, the officer arrested defendant and Contreras. Thereafter,

defendant and Contreras were both charged with possessing stolen mail, and aiding and abetting the possession of stolen mail. Contreras pleaded guilty and agreed to cooperate with the government; defendant was convicted at trial.

As is relevant to this appeal, defendant filed a pre-trial motion to suppress statements she made during the stop after she was handcuffed but before she received *Miranda* warnings (including that the mail "was already in the car"). The district court denied defendant's motion. The court's decision was correct because defendant, while temporarily detained during the officer's investigation, was not in custody when the statements were made.

In any event, even if the challenged statements were admitted in error, any error was harmless beyond a reasonable doubt because overwhelming, independent evidence of defendant's guilt was presented at trial, including: (1) the 44 pieces of stolen mail and "fishing" tool that were found in the car she was driving; (2) testimony establishing that the mail was stolen from at least three different postal collection boxes in the neighborhood; (3) the testimony of an expert witness, establishing the financial incentive for mail theft and proving that the accumulation

of 44 pieces of mail with a flimsy, homemade fishing tool would have required an extended effort; (4) the testimony of Contreras, who explained that he and defendant had been staying at a hotel together and, on the way to and from a friend's house, jointly decided to steal mail in the San Gabriel area for the purpose of washing checks; and (5) the admission of defendant's many other statements not challenged in this appeal, which were inconsistent with each other and the physical evidence, and which demonstrated her consciousness of guilt just as effectively as the challenged statements.  This evidence was so overwhelming that defendant's jury convicted her after less than two hours of deliberation.

Defendant's appeal lacks merit, and this Court should affirm her conviction.[1]

---

[1] Defendant also challenges two supervised release conditions imposed at sentencing.  As detailed below, the government agrees that the Court should issue a limited remand to amend those conditions.

## II

## ISSUES PRESENTED

A.     Did the district court err in holding that defendant was not subject to custodial interrogation when she made statements to a police officer before receiving *Miranda* warnings, including a false exculpatory statement that the stolen mail was "already in the car" when she borrowed it?

B.     Even if the district court erred in denying defendant's motion to suppress, was the admission of the challenged statements at trial nevertheless harmless given the limited nature of the statements and the overwhelming strength of the independent evidence proving that defendant possessed stolen mail, and aided and abetted the same?

C.     Did the district court abuse its discretion in imposing a special condition of supervised release prohibiting defendant, a transgender woman, from using the name "Nadine" in social settings without first obtaining approval from her probation officer?

D.     Did the district court plainly err in imposing the notification of "specific risks" as a condition of defendant's supervised release, where

this Court has since found the condition to be unconstitutionally vague in *United States v. Magdirila*, 962 F.3d 1152 (9th Cir. 2020)?

**III**

**STATEMENT OF THE CASE**

**A.    Jurisdiction, Timeliness, and Bail Status**

The district court's jurisdiction rested on 18 U.S.C. § 3231.  This Court's jurisdiction rests on 28 U.S.C. § 1291 and 18 U.S.C. § 3742.  The district court entered judgment on January 15, 2020.  (CR 152; ER 552.[2])  Defendant filed a timely notice of appeal on January 16, 2020.  (CR 153; ER 544.)  *See* Fed. R. App. P. 4(b)(1)(A)(i).  Defendant is in custody serving the 27-month sentence imposed in this case.

---

[2] "CR" refers to the Clerk's Record in the district court and is followed by applicable docket numbers.  "ER" refers to the Excerpts of Record filed by defendant, "AOB" refers to Appellant's Opening Brief, and "GER" refers to the Government's Excerpts of Record; such references are followed by applicable page numbers.  "PSR" refers to the Presentence Investigation Report, filed under seal by defendant; such references are followed by applicable paragraph numbers.  "Exh. A" refers to Exhibit A, which is dashboard camera footage transmitted to the Court by defendant; such references are followed by applicable time stamps.  "Trial Exh." refers to the government's trial exhibits, which are the subject of the government's concurrently filed Motion to Transmit Exhibits.

**B.     Statement of Facts and Procedural History**

### 1.     *The Traffic Stop and Defendant's Statements*

#### a.     *Officer Martinez sees suspicious activity and a vehicle violation and executes an investigatory stop*

On February 16, 2019, at approximately 3:11 a.m., San Gabriel Police Department Officer David Martinez was patrolling a residential and business area in San Gabriel when he noticed a car stopped on the side of the road, with its headlights on and the driver inside.  (ER 117.) He watched a man, cradling white envelopes in his arms, run toward the car from the direction of a business.  (ER 117.)  Officer Martinez watched the man enter the passenger side of the stopped car.  (ER 117.) The driver immediately drove away.  (ER 117.)

Officer Martinez followed the car and discovered it had expired registration.  (ER 117.)  Based on the time of day, his observations of suspicious activity indicating a possible burglary, recent burglaries in the city, and the expired registration, Officer Martinez pulled the car over.  (ER 117.)

Officer Martinez approached the car and saw defendant in the driver seat and Contreras in the passenger seat.  (ER 117.)  Officer Martinez asked defendant for her license.  (Exh. A 00:01:14; ER 84.)

7

She told him she did not have it on her. (Exh. A 00:01:19; ER 84.) When he asked again, she said that her license had been suspended. (Exh. A 00:01:20-28; ER 84.) When Officer Martinez asked Contreras for his name, he answered, "Charlie Zavala." (Exh. A 00:04:46-52; ER 85.) Soon after, dispatch informed Officer Martinez that "Charlie Zavala" was not a real person. (Exh. A 00:07:12-00:08:01; ER 87.) A second officer arrived to help, and Officer Martinez asked him to help investigate if Contreras and defendant had been involved in a burglary. (Exh. A 00:06:02-33; ER 87.) Officer Martinez also ran the car's license plate through dispatch, and the registration did not come back to either Contreras or defendant. (Exh. A 00:02:03-00:03:41; ER 85.)

### b. *Officer Martinez investigates Contreras's true identity and the stolen mail at his feet*

Approximately ten minutes into the stop, after learning that defendant's license was suspended and Contreras had given him a fake name, Officer Martinez asked defendant to step out of her car. (Exh. A 00:09:53; ER 88.) He patted down defendant and asked her to sit on the curb, but he did not handcuff her. (Exh. A 00:10:04-31; ER 88.) Officer Martinez briefly asked defendant where she was coming from, and where she had picked up Contreras. (Exh. A 00:10:31-55; ER 88-89.)

8

She answered that she had just picked up Contreras from a friend's house.  (Exh. A 00:10:50; ER 89.)  When asked, she said she did not know the friend's address, because she had picked up Contreras while he was walking outside.  (Exh. A 00:10:54-55; ER 89.)[3]

After that questioning, Officer Martinez told defendant that she was being detained but was not under arrest.  (Exh. A 00:11:05; ER 89.) He told her that he was placing her in handcuffs for safety reasons based on the time of day, asked her if she understood (which she affirmed), and then reiterated that she was not under arrest.  (Exh. A 00:11:05-15; ER 89.)  Initially, Officer Martinez had defendant sit on the curb, but then the second officer asked Officer Martinez to place her in the police car instead.  (Exh. A 00:11:47; ER 90.)  As Officer Martinez directed her into the police car, he told her twice more that she was not under arrest.  (Exh. A 00:11:49-00:12:09; ER 90.)

Next, Officer Martinez asked Contreras to step out of the car and sit on the curb.  (Exh. A 00:12:21-50; ER 90.)  For approximately the

---

[3] These statements were referred to as the "curbside statements" in the district court.  The admission of the curbside statements is not being challenged in this appeal.  (*See* AOB 1, 31.)

next fifteen minutes, both officers spoke to Contreras, whose true identity remained unknown. (Exh. A 00:12:24-00:24:14; ER 90-98.) Contreras also feigned ignorance about the stolen mail ("What you mean, who's taking mail?" and "What mail?") and bickered with the officers ("How am I lying to you?"). (Exh. A 00:17:18-00:18:02; ER 94-95.) Contreras denied knowing about the mail and claimed that it was already in the car when he got in. (Exh. 00:17:19-24; ER 94.) The officers called in Contreras's false information multiple times without success, finally concluding that he was "being. . . deceptive" and "trying to lie" to them. (Exh. A 00:17:42-52; ER 93-95.) Eventually, the officers learned Contreras's true name and that he was on probation, which he had violated. (Exh. A 00:24:14; ER 98.) During this conversation, Officer Martinez looked in the car and saw several unopened envelopes on the passenger floorboard, all addressed to and from people other than defendant and Contreras. (ER 117; Exh. A 00:15:10-00:16:36.)

After speaking with Contreras and beginning his search of the car (about 26 minutes into the stop and about 15 minutes since defendant was placed in the patrol car), Officer Martinez returned to defendant

and asked her some questions, which she answered.[4]  Officer Martinez asked defendant who owned the car and if it was stolen.  Defendant said the car belonged to her girlfriend, and it was not stolen.  (Exh. A 00:26:50-57; ER 98-99.)  Officer Martinez asked what defendant and Contreras had been doing, and she replied that she had just picked him up.  (Exh. A 00:26:57-00:27:00; ER 99.)  Officer Martinez then asked defendant, "What's up with the mail?"  (Exh. A 00:27:03; ER 99.)  Defendant answered that the mail was "already in the car."  (Exh. A 00:27:06; ER 99.)  Officer Martinez told defendant that he had seen Contreras running down the street and that the mail was "fresh [] from our city."  (Exh. A 00:27:20-24.)  Defendant denied any involvement with the stolen mail, instead insisting that she was "not trying to get nothing."  (Exh. A 00:27:20-39; ER 100.)  Officer Martinez also asked defendant when she got the car.  (Exh. A 00:28:07; ER 100.)  She replied that she had gotten it a couple hours ago.  (Exh. A 00:28:10; ER 100.)

---

[4] These statements were referred to as the "pre-*Miranda* statements" in the district court.  They are the statements at issue in this appeal.  (*See* AOB 1, 31.)

In total, this exchange took less than two minutes.  (Exh. A 00:26:49-00:28:36.)

### c. *Defendant makes several spontaneous statements and asks repeatedly to speak with Officer Martinez*

Officer Martinez continued to search defendant's car.  Several times, while he was doing so, defendant called over to him, or asked a second officer to relay messages to him.  (Exh. A 00:33:25-00:34:09, 00:37:18-29; ER 103-104, 105-106.)  During this time, defendant made several spontaneous statements, including telling Officer Martinez, "I just came to pick him up" and he "put all that stuff on the ground." (Exh. A at 00:33:48-00:34:00; ER 103.)  Defendant told an officer who was helping process the scene, "I hope I'm not getting arrested."  (Exh. A 00:46:24; ER 107.)  She then again asked an officer, "Am I being arrested?"  (Exh. A 00:54:39; ER 108.)  He told her: "I have no idea yet, we're still in investigation, ma'am."  (Exh. A 00:54:41; ER 108.)

Once he finished searching defendant's car, Officer Martinez read defendant her *Miranda* rights.  (Exh. A 01:00:47; ER 109.)  She confirmed she understood them.  (Exh. A 01:01:01; ER 109.)  Officer Martinez began the interview by asking defendant to respond to

12

statements made by Contreras.  Most relevant here, he asked: (1) where the mail came from; (2) where the car came from; and (3) when she had picked up Contreras.  (Exh. A 01:01:02-01:02:19; ER 109-111.) Defendant told Officer Martinez that: (1) Contreras had the mail with him when she picked him up; (2) the car belonged to her girlfriend, who goes by "Star" or "Brit Moore;" and (3) she had just picked up Contreras when Officer Martinez pulled them over.  (Exh. A 01:01:02-01:02:19; ER 109-111.)[5]

### 2. *Indictment*

In May 2019, defendant and Contreras were indicted for possessing stolen mail, and aiding and abetting the possession of stolen mail, in violation of 18 U.S.C. §§ 1708, 2(a).  (CR 16; ER 58-59.)

### 3. *Denial of Defendant's Motion to Suppress*

Before trial, defendant moved to suppress the "curbside statements," the "pre-*Miranda* statements," and the "post-*Miranda*

---

[5] These statements were referred to in the district court as the "post-*Miranda* statements."  The admission of these statements, as well as the spontaneous statements that proceeded them, are not being challenged in this appeal.  (*See* AOB 1, 31.)

statements." (ER 60-81.) The district court denied defendant's motion. (ER 6-7.)

As to the curbside statements, the district court held them admissible because "Officer Martinez had a reasonable suspicion that the defendant had been involved in a theft or burglary, not simply that her car had an expired registration." (ER 6.) Moreover, Officer Martinez's "investigatory questions were reasonably related in scope to a justification for the stop," because they were "brief," not "unduly prolonged," and "aimed at determining where the defendant and her passenger were coming from." (ER 6.)

As to the post-*Miranda* statements, the district court held them admissible because they were made after defendant made "repeated attempts" to call Officer Martinez over to speak with him and after she "received valid *Miranda* warnings." (ER 7.) Moreover, the statements were not obtained through any "deliberate" or "improper" "two-step inquiry as outlawed in *Missouri [v.] Seibert*." (ER 7.)

Only the pre-*Miranda* statements are at issue on appeal. (*See* AOB 1, 31, 33-38.) The district court held these pre-*Miranda* statements admissible because defendant was not in custody when the

14

statements were made. (ER 6-7.) Three facts informed the court's finding. First, defendant was handcuffed, but "only for officer safety, a fact that she was made aware of." (ER 7.) Second, "she was told numerous times that she was . . . not under arrest." (ER 7.) Third, Officer Martinez's "questioning only occurred for a brief period of time." (ER 7.)

### 4.    *Trial*

After losing the suppression motion, defendant chose to proceed to trial.

### a.    *Officer Martinez testifies regarding the stop and search, and the government admits photographs and recordings into evidence*

In the government's case-in-chief, Officer Martinez testified regarding the traffic stop. (ER 225-275.) Officer Martinez explained that, around 3:00 a.m. on February 16, 2019, he was patrolling a residential and business area when he observed a car stopped on the side of the road with the headlights on and the driver inside. (ER 227-228.) More specifically, the car was parked on Alabama Street, near the corner with Las Tunas Boulevard and facing Las Tunas Boulevard. (ER 230; GER 64.) Officer Martinez then saw a man running to the car,

cradling white envelopes in his arms. (ER 228.) Officer Martinez watched the man run into the passenger side of the stopped car. (ER 228.) The car immediately drove away. (ER 228, 230.) Officer Martinez pursued the car and pulled it over. (ER 231.) When he approached the car, he saw defendant in the driver seat and Contreras in the front passenger seat. (ER 231-233.)

After preliminary questioning, Officer Martinez asked defendant and Contreras to exit the vehicle. (ER 234.) After they exited the vehicle, he saw a pile of mail laying on the ground in front of the passenger seat. (ER 234, 236; GER 1-4.) Officer Martinez testified that the mail appeared to be consistent with the materials he saw in Contreras's arms when he was running, but he noticed there was more mail in the car than the amount Contreras had been carrying. (ER 234-235.)

Officer Martinez searched the car, and he realized that most of the mail was stuck together with a sticky adhesive substance. (ER 238.) He also found a "fishing" tool. (ER 239-240; GER 60-61.) The tool was a pad, about six inches by eight inches. (ER 240-241.) The pad was attached to a nylon strap that was about three feet long. (ER 240.) On the pad was a "very strong adhesive," similar to that used on mousetraps. (ER 240.) Several photographs taken by San Gabriel Police Department were admitted into evidence, including a photograph of the pile of mail in defendant's car and the fishing tool:

 

(GER 4, 60.)

Officer Martinez also testified that there was a blue collection box across the street from where he had seen defendant's car pulled over with the lights on.  (ER 250-251, GER 66.)

The government also introduced several recordings of defendant's statements to Officer Martinez.  First, the government introduced the curbside statements made by defendant just after she was asked to leave her car:

. . .

OFFICER MARTINEZ: . . . I saw -- where's he coming from?

DEFENDANT: Um - I picked him up over here because he came from a friend's house.

OFFICER MARTINEZ: Do you know the address?

DEFENDANT: Um ... no. He lives in-I met him-um, he was walking down from the street and then I picked him up when he was walking outside.

(ER 243-244; Trial Exh. 6 (Exh. A 00:10:40-00:11:05); ER 88-89.)

Next, the government introduced the now-challenged pre-*Miranda* statements defendant made inside the police car:

OFFICER MARTINEZ: Is this your ride?

DEFENDANT: No.

OFFICER MARTINEZ: It's not your ride?  Whose ride is it?

DEFENDANT: It's my girlfriends.

OFFICER MARTINEZ: Is it stolen?

DEFENDANT: No.

OFFICER MARTINEZ: What's up? What were, honestly, what were you guys doing?

DEFENDANT: I had just came to pick him up.

OFFICER MARTINEZ: Okay, what's up with the mail?

DEFENDANT: Huh?

OFFICER MARTINEZ: What's up with the mail?

DEFENDANT: That was already in the car.

OFFICER MARTINEZ: It was already in the car?

DEFENDANT: Yeah.

OFFICER MARTINEZ: Are you lying to me?

DEFENDANT: No.

(ER 245; Trial Exh. 7 (Exh. A 00:26:50-00:27:10); ER 98-99.)

She also said that she had picked the car up from her girlfriend a couple hours before. (ER 245; Trial Exh. 8 (00:27:44-00:28:20); ER 100-101.)

The government also introduced Contreras's statement to Officer Martinez that the mail was inside the car already when he got in. (ER 247; Trial Exh. 19.)

Approximately five minutes later, while Officer Martinez was busy searching the car, defendant called out to him:

> DEFENDANT: Ok, look, I just came to pick him up. When he came in the car, um-I'mma be honest with you, like he had put all that stuff on the ground.
>
> OFFICER MARTINEZ: Okay.

(ER 246; Trial Exh. 9 (Exh. A 00:33:48-00:34:00); ER 103.)

Approximately 30 minutes later, defendant made her post-*Miranda* statements. In those, she reaffirmed that she had just picked up Contreras, and he had the mail with him then:

> DEFENDANT: He came in with the mail.
>
> OFFICER MARTINEZ: Okay, what time did you pick him up?
>
> DEFENDANT: I just was picking him up right now.
>
> OFFICER MARTINEZ: When I saw you guys?
>
> DEFENDANT: Yeah, he said he - he had, um, an emergency or whatever we should come pick him up.
>
> . . .
>
> OFFICER MARTINEZ: Okay. So when you brought him - when you picked him up, you said that he had the mail in his hands?
>
> DEFENDANT: Huh?
>
> OFFICER MARTINEZ: He had the mail in the hand- in his hands, when you picked him up?

DEFENDANT: Yeah.

. . .

(ER 246; Trial Exh. 10 (Exh. A 01:01:26-01:02:21); ER 109-111.)  She

also confirmed that she borrowed the car from her friend "Star."  (ER

246; Trial Exh. 10 (Exh. A 01:01:39-43); ER 110.)

Defendant and Contreras were arrested.  (ER 247.)  In total,

defendant and Contreras had 44 pieces of mail, none of which were

addressed to either of them.  (ER 393; GER 6-14, 15-59.)  None of the

mail was post-marked, suggesting it had been stolen after drop-off but

before entering the mail stream.  (ER 394.)

### b.   *An expert witness explains mail theft*

Next, a United States Postal Inspector testified as an expert

witness.  (ER 297-305.)  The Inspector explained that mail thieves used

fishing tools like the one seized from defendant's car to steal mail from

collection boxes.  (ER 302.)  A mail thief would use the strap to drop the

tool into a collection box, where the sticky pad would adhere to the mail.

(ER 302.)  The mail thief would then pull on the strap and remove the

fishing tool and the attached mail from the mailbox.  (ER 302.)

The Inspector testified that smaller, lighter fishing tools like the one found in defendant's car (handmade and weighted down by only a few coins) typically only pick up two or three pieces of mail at once. (ER 303-304.) Accordingly, in order to steal a significant amount of mail, a mail thief using such a tool would need to "fish" many times. (ER 303-304.) She also explained that mail thieves typically target blue collection boxes because they contain outgoing mail, which often includes checks and bill payments. (ER 304.) Mail thieves then "wash" the checks, meaning they use a chemical to "remove the information from the front of the check so they can put it in their name and cash it," thus rendering mail theft profitable. (ER 304.)

### c. *Victims testify that they deposited the stolen mail in postal collection boxes near the site of defendant's arrest*

Several mail-theft victims then testified regarding the mail found in defendant's car, proving that the mail was stolen from multiple collection boxes.

For example, several unopened envelopes with return addresses for Oriental Air Transport, a freight forwarding company, were found in defendant's car. (GER 52-59.) Oriental Air Transport employees

testified that: (1) the mail contained checks intended to pay bills owed to the company's vendors; and (2) just hours before defendant's arrest, an employee placed the mail in a collection box. (ER 309-310, 314-315.) The employee remembered and identified the particular collection box he used. (ER 314-315; GER 68-70.)

Additionally, the owner of a San Gabriel pharmacy identified three large envelopes found in defendant's car—with prescription medication still inside—as medication he had placed in the mail for his patients. (ER 294-296; GER 26-28.) The pharmacist testified that he used the blue collection boxes located outside the San Gabriel Post Office to ship medication. (ER 292; GER 71-74.) These mailboxes are different from the one identified by the freight company employee.

### d. *Contreras testifies about defendant's role in the mail theft*

Contreras also testified in the government's case. (ER 328-378.) Contreras testified that, on the night of their arrest, he and defendant began their evening at the Quality Inn in Downey, California, where they were staying with their friend "Star." (ER 331-332.) The brakes on defendant's car were not working, so when he and defendant left the hotel that night, they took Star's car. (ER 332.)

They stopped in San Gabriel to fish for mail, on their way to a friend's house in Arcadia to buy drugs. (ER 333.) Contreras and defendant took turns fishing, using a tool that Contreras made from materials that defendant gave him. (ER 333-334, 336-337.) They noticed San Gabriel had several blue collection boxes in the area, so on the way back from their friend's house, they stopped to fish for more mail. (ER 333-334.) Contreras got out to steal mail, while defendant waited in the car near the corner, ready to turn into the intersection when he returned. (ER 335.) As he was carrying mail back to the car, Contreras noticed a police car drive by. (ER 334.) He could tell the officer had seen him. (ER 334.) After he got in the car, defendant began driving. (ER 334.) In the moments before they were pulled over, Contreras and defendant agreed that they should tell the officer that the mail was already in the car. (ER 335-336.)

Their motive, Contreras explained, was to find checks so they could wash and cash them. (ER 337-339.) He and defendant had stolen mail and washed checks together before, at least five times. (ER 338-339.) They always "split the money" in "half." (ER 339.)

Contreras estimated that the fishing tool he was using that evening could retrieve up to four envelopes per cast (if the collection box was full, less if it was not). (ER 337.) He remembered that he retrieved the large pharmacy envelopes containing medication one at a time; they took a few fishing attempts to remove from the mailbox. (ER 337.)

Contreras explained that he had known defendant (who he knew as "Nadine") for eight to ten years. (ER 329.) They were friends and had many mutual friends. (ER 330.) Defendant knew that Contreras had been in trouble for stealing mail and washing checks. (ER 339.)

On cross-examination, defense counsel questioned Contreras extensively about his criminal history, his prior bad acts, and his cooperation with law enforcement. (ER 339-349, 354-361, 366-375.)

### e. *The case agent testifies to mail theft investigation and defendant's additional statements*

Finally, the government called the case agent, United States Postal Inspector Kimberly Granger, to testify regarding her mail theft investigation. (ER 388-425.) Inspector Granger explained that the collection boxes identified by the victims were different from each other, and different from the USPS collection box across the street from where Officer Martinez saw Contreras carry mail to defendant's car. (ER 395-

398, 401-403.) Using a map, Inspector Granger identified three sets of

collection boxes: (1) the mailbox used by the freight company employee

(the red circle furthest to the right on the map); (2) the four mailboxes

identified by the pharmacist, one of which he used to deposit stolen

pharmacy mail (the four red circles furthest to the left); and (3) the

mailbox right across from where defendant's car was parked and from

which Contreras was seen running, carrying envelopes, to defendant's

car (the centermost red circle). (ER 402-403.) The mailboxes spanned

several intersections and nearly a quarter-mile:



(GER 75.)

Inspector Granger also explained that she conducts fingerprint and DNA analysis in mail fishing cases only when mail is strewn about a car containing several people, or where officers seize an exceptionally high volume of stolen mail (over 500 pieces). (ER 391.) Additionally, she testified that it would not have been practical to submit this mail for forensic review, because the lab likely could not obtain DNA or fingerprints from mail that was covered in a sticky substance. (ER 422.) Moreover, the fingerprint lab had a two-year backlog. (ER 422.)

Inspector Granger also testified about statements defendant made in a *Mirandized* interview when she arrested defendant on the federal charges. Defendant told Inspector Granger that: (1) she and Contreras had been friends for years; (2) the evening of their arrest, they were on their way to Azusa, California to buy drugs; (3) the car they were driving belonged to her friend "Star"; (4) while they were driving, Contreras asked her to pull over; (5) Contreras got out of the car, and when he returned, she saw that he had mail and a fishing tool; (6) he

27

left the car again, and came back again; and (7) they drove away, and were stopped by the police.  (ER 404-406.)[6]

### f.   The government and defense rest

The defense chose not to call any witnesses.  (ER 426.)  At the close of evidence, the parties read a stipulation of fact to the jury, in which the parties agreed that from February 15 to February 16, 2019, defendant's car was parked at the Quality Inn.  (ER 426.)

### g.   The district court instructs the jury and the parties argue the evidence

The district court instructed the jury that defendant could be convicted either as a principal, or as an aider and abettor.  (ER 488-491.)  The court also instructed the jury that it could find defendant acted knowingly to assist Contreras for the purposes of aiding and abetting liability, if it found that defendant: (1) "was aware of a high probability that the defendant's passenger, Marco Contreras, possessed stolen mail;" and (2) "deliberately avoided learning the truth."  (ER 490-491.)

---

[6] Inspector Granger also introduced two maps of the San Gabriel Valley area.  (ER 389-390; GER 62-63.)

In closing, the government argued that defendant was "not just a naïve and clueless driver" who simply chose to hang out with a "bad friend[]." (ER 430.) The government argued that, even "setting aside anything you heard from Marco Contreras," the trial evidence proved defendant's guilt. (ER 430.) First, the fishing tool was discovered out in the open, on the passenger floorboard, and Contreras had been using it to fish for mail. (ER 431.) It was an unusual looking object—if you saw it and did not know what it was, you would ask about it; if you saw it, and you knew it was, then you also would know its purpose. (ER 431.) Second, the "sheer amount of mail" in the car was compelling. The fishing tool only collected a maximum of four pieces of mail per cast, and defendant had ten times that amount in her car. (ER 431-432.) Third, the victim testimony showed that the mail came from at least three different mailboxes. (ER 432-433.) In sum, "getting this amount of mail did not happen in an instant." (ER 433.) Rather, it was an "extended concerted effort by both the defendant and Marco Contreras." (ER 433.) The government then reviewed the elements of the crime in the context of the trial evidence, including Contreras's testimony and defendant's various statements. (ER 433-439.)

In its closing argument, the defense argued to the jury that
"Contreras had a plan of his own," and that "[w]ithout [defendant's]
knowledge, without her consent, . . . he brought stolen mail into the car
she was driving."  (ER 440.)  Defense counsel also argued that "this case
comes down to the word of Marco Contreras," and the "only way" the
jury could find defendant guilty is if they found "beyond a reasonable
doubt that Mr. Contreras was telling the truth."  (ER 441.)

On rebuttal, the government argued again that, even without
Contreras's testimony, the undisputed facts proved defendant's guilt
beyond a reasonable doubt.  (ER 456-457, 460.)   Contreras's testimony
simply provided the "complete picture" of that night, and "simply
corroborate[d]" what the jury "already kn[e]w without hi[s testimony]."
(ER 460.)  The government also reminded the jury that, on the aiding
and abetting theory, "in order to be convicted of this crime, defendant
Paishon need not have touched a single thing."  (ER 459.)  "She never
had to touch the mail," and "[s]he never had to touch the fishing device."
(ER 459.)  "All she had to know [was] what was happening and help
out," "[a]nd if she knew those things," then "she [was] guilty beyond a
reasonable doubt."  (ER 459.)

### 5. *Conviction*

The jury convicted defendant on the single count of possessing stolen mail. (ER 502-503.) Deliberations lasted approximately 100 minutes. (ER 498-503; GER 76.)

### 6. *Sentencing*

The district court sentenced defendant to a mid-Guidelines term of 27 months' imprisonment and three years of supervised release. (ER 45, 52.) The court also imposed several conditions of supervised release, including two that are relevant to this appeal. (ER 51-52.)

First, the court imposed Special Condition 9, which mandates that:

> 9. The defendant shall not obtain or possess any driver's license, Social Security number, birth certificate, passport or any other form of identification in any name, other than the defendant's true legal name, nor shall the defendant use, any name other than his true legal name, without the prior written approval of the Probation Officer.

(ER 53.) Defendant objected to this condition, requesting that the district court modify it so that she be allowed to use the name "Nadine" socially. (ER 15.) The district court overruled the objection. (ER 15.)

Second, the district court ordered defendant to comply with the standard conditions in the Central District of California's General

31

Order 18-10.  (ER 11, 52.)  Defendant did not object to the imposition of these standard conditions.  One of those conditions is Standard Condition 14, which provides:

> 14. As directed by the probation officer, the defendant must notify specific persons and organizations of specific risks posed by the defendant to those persons and organizations and must permit the probation officer to confirm the defendant's compliance with such requirement and to make such notifications.

(ER 52, 55.)  After sentencing, defendant brought this appeal.

# IV

# SUMMARY OF ARGUMENT

The district court correctly ruled that defendant was not in custody when she made the "pre-*Miranda* statements," which included her statements that: (1) the car belonged to her girlfriend; (2) the stolen mail was already in the car when she borrowed it; (3) she had just picked up Contreras; and (4) she borrowed the car a couple hours before.  Preliminarily, although defendant was handcuffed and placed in a patrol car, such facts do not automatically render a suspect in custody.  *See, e.g.*, *United States v. Booth*, 669 F.2d 1231, 1236 (9th Cir. 1981); *United States v. Bautista*, 684 F.2d 1286, 1287-88, 1292 (9th Cir. 1982).  Under the particular circumstances here, a reasonable person in

32

the suspect's position would have understood that the measures were for officer safety and due to the stop's circumstances, and not because she was under arrest. In fact, defendant was explicitly told four times that she was not under arrest, a fact which she affirmed she understood. Moreover, the pre-*Miranda* questioning was: (1) brief (only two minutes); (2) related to the basis for the investigatory stop (the theft Officer Martinez suspected when he saw Contreras running with envelopes to defendant's car); and (3) not aggressive or coercive in a manner that this Court has held may render a suspect in custody. Accordingly, the district court did not err in permitting the admission of these statements at trial.

Moreover, even if the pre-*Miranda* statements were admitted in error, any such error was harmless beyond a reasonable doubt. The only statement defendant contends was harmful from the pre-*Miranda* statements is the statement that the mail was "already in the car." But this was a limited, false exculpatory statement, and "substantial, independent, and credible evidence" apart from this statement existed to prove that defendant could not have been the innocent, unaware driver that she purported to be. *United States v. Noti*, 731 F.2d 610,

615-16 (9th Cir. 1984). First, defendant waited in the car with the lights on at 3:00 a.m. while Contreras stole mail, and then immediately drove away after he jumped into her car, holding stolen mail. Second, a conspicuous pile of mail and a fishing tool were easily visible in defendant's car. Third, the evidence showed that defendant and Contreras had accumulated 44 pieces of mail over the course of the night, using a tool that would have required several successive tries. Fourth, that mail was stolen from at least three different collection boxes, nearly a quarter mile apart. Fourth, defendant's additional exculpatory statements—apart from the pre-*Miranda* statements she challenges on appeal—were also demonstrably false, and therefore demonstrated her consciousness of guilt as much as the challenged statement. Fifth, Contreras testified that he and defendant were friends on a joint mission to steal mail and wash checks, which they had done together before. In sum, because overwhelming credible, reliable evidence—with or without Contreras's testimony—proved that defendant was a willing and knowing participant in an extended mail-theft effort, the admission of the pre-*Miranda* statements, if in error, was harmless beyond a reasonable doubt.

Finally, this Court should vacate defendant's sentence and remand to the district court for the limited purposes of: (1) amending Special Condition 9 to permit defendant to use the name "Nadine" in social settings without the prior approval of her probation officer; and (2) correcting Standard Condition 14 so that it "accords with [defendant's] criminal history," pursuant to this Court's decision in *United States v. Magdirila*, 962 F.3d 1152, 1159 (9th Cir. 2020).

## V

## ARGUMENT

### A. The District Court Properly Denied Defendant's Motion to Suppress the Pre-*Miranda* Statements Because Defendant Was Not in Custody When She Made Them

#### 1. *Standard of Review*

This Court reviews de novo the district court's denial of a motion to suppress. *United States v. Arreguin*, 735 F.3d 1168, 1174 (9th Cir. 2013). The district court's underlying factual findings are reviewed for clear error. *Id.*

#### 2. *Legal Framework*

Suppression of a defendant's pre-*Miranda* statements is warranted only if a defendant is both in custody and subject to interrogation. *Berkemer v. McCarty*, 468 U.S. 420, 434 (1984). In

35

determining whether a defendant was "in custody," this Court must first consider whether "a reasonable innocent person" under the circumstances "would conclude that after brief questioning he or she would not be free to leave." *United States v. Bassignani*, 575 F.3d 879, 883 (9th Cir. 2009). Whether a defendant was in custody is an objective inquiry, and is not based on the subjective views of the interrogating officer or of the person being questioned. *Stansbury v. California*, 511 U.S. 318, 323 (1994).

In determining whether a defendant was in custody, the Court should consider several factors, including: "(1) the language used to summon the individual; (2) the extent to which the defendant is confronted with evidence of guilt; (3) the physical surroundings of the interrogation; (4) the duration of the detention; and (5) the degree of pressure applied to detain the individual." *Bassignani*, 575 F.3d at 883.

Importantly, however, the Supreme Court has made clear that "[d]etermining whether an individual's freedom of movement was curtailed . . . is simply the first step in the analysis, not the last." *Howes v. Fields*, 565 U.S. 499, 509 (2012). In other words, the "freedom-of-movement test identifies only a necessary and not a

sufficient condition for *Miranda* custody." *Id.* If a reasonable person would not feel free to leave, then courts must go on to "ask[] the additional question whether the relevant environment presents the same inherently coercive pressures as the type of station house questioning at issue in *Miranda*." *Id.* Particularly in the context of a valid investigatory stop, "[w]e have decline[d] to accord talismanic power to the freedom-of-movement inquiry." *Id.* (citing *Berkemer*, 468 U.S. at 437) (internal quotation marks omitted). Instead, the Supreme Court has held that *Miranda* warnings are only required if the totality of the circumstances shows that a reasonable person would understand that he or she was subject to "a formal arrest or restraint on freedom of movement of the degree associated with a formal arrest." *Stansbury*, 511 U.S. at 322 (internal quotation marks and citation omitted).

### 3. Defendant Was Not In Custody When She Made the Pre-Miranda Statements to Officer Martinez

Here, based on the totality of the circumstances, defendant was not in custody when she made the pre-*Miranda* statements.

### a. *Defendant's Handcuffing and Placement in the Patrol Car Did Not Mean that She Was in Custody*

Under the circumstances of this case, a reasonable person in defendant's position would have understood that handcuffing and being placed in the patrol car did not amount to an arrest. "Handcuffing a suspect does not necessarily dictate a finding of custody." *Booth*, 669 F.2d at 1236. Nor does being held inside of a police car. *See, e.g.*, *United States v. Hudgens*, 798 F.2d 1234, 1237 (9th Cir. 1986) ("The fact that [defendant's] voluntary statements were made in a police car does not render them inadmissible."); *see also United States v. Leshuk*, 65 F.3d 1105, 1109-10 (4th Cir. 1995) ("[D]rawing weapons, handcuffing a suspect, placing a suspect in a patrol car for questioning, or using or threatening to use force does not necessarily elevate a lawful stop into a custodial arrest for *Miranda* purposes.").

The government acknowledges that placing someone in a patrol car and using handcuffs "substantially aggravates the intrusiveness" of a stop and are important factors bearing on custody. *Bautista*, 684 F.2d at 1289. However, this Court and others have found that during an investigatory stop measures like handcuffing or placing a suspect in a patrol car do not necessarily render a suspect in custody for the

38

purposes of *Miranda*, where the restraints are justified by the nature of the stop and where the questioning is brief or related to the basis of the investigatory stop. *See Bautista*, 684 F.2d at 1287-88, 92 (concluding defendants were "not in custody" when they were handcuffed, separated by about 30 feet for questioning, and then questioned for approximately 10 to 12 minutes related to circumstances surrounding a bank robbery); *id.* (affirming that the "use of the handcuffs during the separate questioning was reasonable under the circumstances"); *United States v. Cervantes–Flores*, 421 F.3d 825, 828, 830 (9th Cir. 2005) (affirming that *Miranda* warnings were not required where suspect in illegal re-entry case questioned in handcuffs, where the officer's questions about the suspect's country of citizenship, whether the suspect had immigration documents, and how he crossed the border were brief and reasonably related to scope of the stop), *overruled on other grounds, Melendez-Diaz v. Massachusetts*, 557 U.S. 305 (2009); *United States v. Fornia–Castillo*, 408 F.3d 52, 63-65 (1st Cir. 2005) (holding that suspect not in custody even though officers approached him with guns drawn and handcuffed him for 10 or 15 minutes before handcuffs were removed); *United States v. Murray*, 89 F.3d 459, 462 (7th Cir. 1996) (holding that defendant not

in custody when he was questioned about a gun found in his car even though he was seated in the back of the police car at the time).

That is the case here. Under the particular circumstances, a "reasonable [person] in the suspect's position would have understood" that although she was temporarily detained, she was not under arrest. *Berkemer*, 468 U.S. at 442. Officer Martinez clearly told defendant that she was "not under arrest" four times—twice when she was handcuffed, and twice when she was placed in the police car. (Exh. A 00:11:05-15, 00:11:49-00:12:09; ER 89, 90.) As Officer Martinez explained to defendant, the measures were because of the "time of day" and "[f]or safety," which defendant affirmed that she understood. (Exh. A at 00:11:05-15; ER 89.) It was past 3:00 a.m., and there were two suspects in defendant's car. (ER 227.) Given the dangers of investigatory stops, especially ones involving more than mere traffic infractions, it was reasonable for the two officers on scene to temporarily secure defendant and focus on Contreras, particularly because Officer Martinez suspected Contreras of burglary, Contreras had lied to the officers about his identity, the officers could not confirm whether Contreras had any outstanding warrants, and the officers had not yet searched Contreras

or the vehicle. (ER 87, 90-98, 117.) Defendant was also well aware that Contreras had lied about his identity because Contreras gave the officers false information before they were asked to exit the vehicle. (Exh. A 00:04:46-00:05:57; ER 85-87.) Accordingly, defendant knew both the detention's limited purpose and the key facts justifying it. Such disclosures—both informing defendant she is not under arrest, and of the reasons for the restraints—are important facts to be considered in assessing whether a reasonable person would have viewed the interaction as a restraint associated with a formal arrest. *See United States v. Newton*, 369 F.3d 659, 676 (2d Cir. 2004) (noting that such disclosures are "fact[s] that may be considered in assessing the extent to which a reasonable person would understand any restraints on [her] freedom to be comparable to those associated with a formal arrest"); *cf. United States v. Bravo*, 295 F.3d 1002, 1011 (9th Cir. 2002) (in the context of whether a detention constituted an arrest, explaining that, although "an officer cannot negate a custodial situation simply by telling a suspect that he is not under arrest," such statements "are a factor" in the totality-of-circumstances analysis and can work to "negate the handcuffs' aggravating influence"). A "reasonable innocent person"

in this setting, having been told that the restraints were only for officer safety and that she was not under arrest, would have understood that her temporary detention did not amount to arrest. *Bassignani*, 575 F.3d at 883. Tellingly, even several minutes after she gave the pre-*Miranda* statements, defendant did not believe that she was under arrest. (*See* Exh. A 00:46:24, ER 107 (defendant telling an officer she hoped she was not being arrested); Exh. A 00:54:39-41, ER 108 (defendant asking if she was under arrest, and being told that officers were still conducting their investigation).)

Defendant relies heavily on *United States v. Henley*, 984 F.2d 1040 (9th Cir. 1993), to argue that an interviewee who is handcuffed in a police car is *per se* in custody. (*See* AOB 33-36.) Not so. This Court has never held, and *Henley* does not purport to hold, that such facts establish a bright-line rule regarding custody. Rather, this Court has reiterated that the custody determination is highly fact-specific. *See, e.g.*, *United States v. Crawford*, 372 F.3d 1048, 1059 (9th Cir. 2004) (the question of custody "requires a court to examine the totality of the circumstances"). Moreover, since *Henley*, in which this Court treated the "free to leave" factor as the end of the analysis, *Henley*, 984 F.2d at

42

1042, the Supreme Court has clarified that an interviewee's ability to end questioning and leave is the beginning, not the end, of the custodial determination, *Fields*, 565 U.S. at 509. The other facts in *Henley* are readily distinguishable. While the factual background in *Henley* is limited, it appears defendant was arrested by officers and federal agents during an active bank robbery investigation. 984 F.2d at 1042. It did not appear to involve an investigatory car stop, which are often sudden, unpredictable, and low on manpower. *See, e.g.*, *Arizona v. Johnson*, 555 U.S. 323, 330 (2009) ("Traffic stops are especially fraught with danger to police officers."). Moreover, while defendant was told he was not under arrest, the record in *Henley* is silent on whether the defendant was informed of any reason for why he was being handcuffed aside from being under arrest. 984 F.2d at 1041-42.

So too with *United States v. Newton*, 369 F.3d 659, 663, 675 (2d Cir. 2004), on which defendant also relies. (AOB 36.) *Newton* involved a planned search of an apartment by six law enforcement officers. 369 F.3d at 663. Again, *Newton* did not involve the same safety concerns presented by an officer's late night car stop, which is sudden and lacks similar manpower. And while the suspect was told generally that the

43

handcuffs were "for his own safety as well as that of the officers," he was not provided any understandable reason for why such restraints were necessary. *Id.* at 663, 677 (noting that the record did not reflect the reason for the handcuffing, which is that the officers believed there may have been a gun in the house). By contrast, Officer Martinez's actions here, the reasons for which were communicated to and understood by defendant, reflected those circumstances and would have been understood by a reasonable person in defendant's position.

### b. *Additional Factors Also Weigh Against a Finding of Custody Here*

Several other factors that courts look to in determining custody also weigh against finding that defendant was in custody, including: (1) the limited duration of the interrogation; (2) the limited extent to which defendant was confronted with evidence of her guilt; and (3) the fact that the interrogation did not present the same inherently coercive pressures as the station-house questioning at issue in *Miranda*.

First, the brevity of defendant's pre-*Miranda* interview weighs against a finding of custody. This Court and the Supreme Court have routinely considered the duration of questioning in evaluating whether a defendant was in custody. *See Fields*, 565 U.S. at 509 (identifying the

"duration" of the interview as a relevant factor); *United States v. Kim*, 292 F.3d 969, 977 (9th Cir. 2002) (noting that defendant was faced with "a full-fledged interrogation, not a brief inquiry").

Here, the questioning took less than two minutes and the primary statement at issue (that the mail was "already in the car") took place in the first 15 seconds. (Exh. A 00:26:50-00:27:05; ER 98-99.) This extremely short duration weighs in favor of finding that defendant was not in custody. *Compare Bautista*, 684 F.2d at 1289 (finding that defendant who was handcuffed and questioned for 10 to 12 minutes was not in custody), *Fornia–Castillo*, 408 F.3d at 65 (finding no custody where defendant was handcuffed for "ten or fifteen minutes"), *with United States v. Lee,* 699 F.2d 466, 468 (9th Cir. 1982) (finding a suspect was in custody where he "was questioned in a closed FBI car with two officers for well over an hour while police investigators were in and around his house").

While defendant was in handcuffs for 15 minutes before the pre-*Miranda* statements, those 15 minutes were not a part of the interview, because she was not subject to any questioning during that time. Moreover, the fifteen-minute wait was not intended to intimidate or

coerce defendant, but was caused by her co-defendant's refusal to cooperate with the officers and their need to identify him (which they could not do until over 24 minutes into the stop) and the need to investigate the many crimes for which the officers had reasonable suspicion. *Cf. United States v. Richards*, 500 F.2d 1025, 1029 (9th Cir. 1974) (in addressing the length of a *Terry* stop, stating that "where the suspects' own unsatisfactory responses to legitimate police inquiries were the principal cause of the extended detainment, the delay of slightly over an hour was not unreasonable"); *Bautista*, 684 F.2d at 1291 (explaining that follow-up questions related to the basis of the stop were reasonable when "made necessary by defendant's unconvincing and suspicious answers to the initial, routine questions").

Second, while Officer Martinez did confront defendant with some evidence of her guilt, his questioning was not "aggressive, coercive, and deceptive" in tone. *Bassignani*, 575 F.3d at 884. (AOB 38.) To the contrary, the first time Officer Martinez mentioned the stolen mail to defendant, he simply asked her, "What's up with the mail?" (Exh. A 00:27:01; ER 99.) This was an open-ended question that defendant

immediately answered by telling him that the mail was "already in the car." (Exh. A 00:27:05; ER 99.)

This brief questioning is in stark contrast to the facts in *United States v. Beraun-Panez*, 812 F.2d 578 (9th Cir.), *modified*, 830 F.2d 127 (9th Cir. 1987), and *United States v. Wauneka*, 770 F.2d 1434, 1439 (9th Cir. 1985), both of which are cited and discussed in *Bassignani*, the case on which defendant relies. (AOB 38.) In *Beraun-Panez,* officers repeatedly accused the defendant of lying, confronted him with false or misleading witness statements, employed good cop/bad cop tactics, took advantage of insecurities related to his alien status, and insisted on the truth. 812 F.2d at 580. While the defendant "initially denied involvement," he eventually succumbed and "finally admitted" to his crimes after and in response to these tactics. *Id.* at 579. Similarly, in *Wauneka*, agents interviewed the defendant four times, told the defendant he had provided information only the perpetrator could know, told the defendant that he could face prison time for lying, and emphasized the seriousness of the crime at issue. 770 F.2d at 1437, 1439. At long last, in the final interview, and after breaking down

47

crying, the defendant nodded his head and said "yes" when asked if he committed the rape at issue. *Id.*

Here, defendant suffered no such treatment. Officer Martinez did not wear defendant down through aggressive and deceptive tactics until she made the pre-*Miranda* statements. As described above, defendant offered the statement that the mail was "already in the car" after an open-ended question, which was much closer to "merely ask[ing]" about the evidence than challenging her with other "known facts" of guilt. *United States v. Norris*, 428 F.3d 907, 913 (9th Cir. 2005). After defendant said that the mail was "already in the car," Officer Martinez asked her if she was lying, and told her that he had seen Contreras running and her driving. (AOB 38.) But this questioning, which encompassed less than two minutes, was hardly as extensive as in *Beraun-Panez* or *Wauneka*. More to the point, it came after, and had no role in, defendant's statement that the "mail was already in the car."[7]

---

[7] Defendant also argues that the officer "lied to defendant" about the time of night. (AOB 38.) This misstatement regarding the time of night, however, came at the end of the interview and had nothing to do with convincing or coercing defendant into making any statements about the mail theft. (Exh. A 00:28:14-36; ER 101.)

Finally, this case does not "present[] the same inherently coercive pressures as the type of station house questioning at issue in *Miranda*." *Fields*, 565 U.S. at 509. For example, in *Miranda v. Arizona*, the Court explained that an interrogation is likely to be coercive where it "take[s] place incommunicado," resulting in "a gap in our knowledge as to what in fact goes on in the interrogation room"; where "[t]he guilt of the subject is . . . posited as a fact" and the police officer "direct[s] his comments toward the reasons why the subject committed the act, rather than . . . asking the subject whether he did it" in order to psychologically manipulate a defendant; where the police officer "interrogate[s] steadily and without relent . . . for a spell of several hours"; or where the "police . . . persuade, trick, or cajole [the interviewee] out of exercising his constitutional rights." 384 U.S. 436, 445, 448, 450-51, 455 (1966). These coercive features are absent here.

As the Supreme Court has repeatedly recognized, "[v]oluntary confessions are not merely a proper element in law enforcement" but "an unmitigated good essential to society's compelling interest in finding, convicting, and punishing those who violate the law." *Maryland v. Shatzer*, 559 U.S. 98, 108 (2010) (quotation and internal

quotation marks omitted). Accordingly, the *Miranda* doctrine should be "enforced strictly, but only in those types of situations in which the concerns that powered the decision are implicated." *Fields*, 565 U.S. at 514 (internal quotation marks omitted). Here, because, under the circumstances, a reasonable person would have understood that she was not in custody, and because defendant's interview does not contain the same inherently coercive pressures that animated the holding in *Miranda*, this Court should hold that defendant was not in custody when she made the pre-*Miranda* statements to law enforcement.

## B. Even If the Admission of Defendant's Statements Was In Error, their Admission Was Harmless Beyond a Reasonable Doubt

### 1. *Legal Standard*

"The admission of statements made in violation of a person's *Miranda* rights is reviewed for harmless error." *United States v. Williams*, 435 F.3d 1148, 1151 (9th Cir. 2006). Constitutional error is harmless when it appears "beyond a reasonable doubt that the error complained of did not contribute to the verdict obtained." *Chapman v. California*, 386 U.S. 18, 24 (1967). It is the government's burden to show that the admission of statements in violation of a defendant's

*Miranda* rights is harmless beyond a reasonable doubt. *Williams*, 435 F.3d at 1162.

### 2. ***Overwhelming Evidence, Independent of the Pre-*Miranda *Statements, Proves Defendant's Guilt***

Even if defendant's pre-*Miranda* statements were admitted in error, any such error was harmless beyond a reasonable doubt. The only pre-*Miranda* statement truly at issue here—that the mail was "already in the car" when defendant borrowed it from her friend—is a limited, false exculpatory statement, and "substantial, independent, and credible evidence of [defendant's] guilt" was presented at trial. *Noti*, 731 F.2d at 615-16.[8]

---

[8] Defendant does not contend that any other pre-*Miranda* statements were harmful. (*See* AOB 32, 39-40 (referencing only this statement).) Nor could she, because the other statements—that the car was not defendant's (it was her girlfriend's), she borrowed it a couple hours before, and that defendant had "just" picked up Contreras—were undisputed at trial and repetitive of other statements made by defendant, admitted at trial, and not challenged on appeal. (*See, e.g.*, ER 404 (defendant's statement to Inspector Granger that the car belonged to her friend "Star"); ER 89, Trial Exh. 6 (defendant's curbside statement that she had "just" picked up Contreras on the "street"); ER 110, Trial Exh. 10 (defendant's post-*Miranda* statement that she was "just picking him up right now"); ER 426 (stipulating to the fact that defendant's car had been parked at the Quality Inn hotel that evening, directly supporting Contreras's testimony that they had been driving together in Star's car since then.))

First, the jury was given compelling physical evidence. There were 44 pieces of mail piled on the floor in the passenger side of the car, some of which was still stuck to a "fishing" tool. (ER 234, 238, 242; GER 1-4.) As the government argued at closing, this pile of mail and tool would have been easily visible to the driver. (ER 431, 436.) What's more, this amount of mail took a while to accumulate. As the government's mail-theft expert testified, a typical homemade "fishing" tool like this one can pick up only a few pieces of mail at one time. (ER 304.) Contreras confirmed this, stating that the tool could retrieve up to four pieces at a time if the collection box was full (less if it was not). (ER 337.) Therefore, as the government argued, defendant's and Contreras's accumulation of 44 pieces of mail would have taken multiple fishing attempts and an extended period of time. (ER 433.) This physical evidence alone eviscerates the foundation of defendant's defense, which is that she was simply an unwitting, uninvolved driver who was unfairly surprised by her passenger's sudden decision to steal mail. (*See, e.g.*, ER 220 ("[Contreras] got out and stole mail, and he brought it into the car that Ms. Paishon was driving. She didn't know he was going to do that.").)

Second, the mail-theft victims' testimony proved that they had deposited their mail in two separate collection boxes. (ER 292, 314-315.) These two boxes were different from a third collection box, located on the corner from which Officer Martinez saw Contreras running with mail. (ER 249-251; GER 66.) Together, these three collection boxes were scattered across nearly a quarter-mile area, separated by multiple intersections. (ER 402-03; GER 75.) This evidence proved that defendant, even if she was only the driver, made multiple stops, with Contreras getting out with his fishing tool and returning with stolen mail each time. Defendant argued that Contreras could have run to each and stolen mail without defendant's involvement.[9] (ER 447.) But Officer Martinez stated that there was more mail in the car than he had seen Contreras carrying when he ran in the final time. (ER 234.) And when Officer Martinez saw them, defendant was waiting in the car, with the headlights on, immediately across the street from a collection

---

[9] Defendant argued to the jury that the mailboxes were less than .1 miles apart. (ER 447; ER 409 (cross-examination of Inspector Granger).) But as the trial exhibit (admitted into evidence without objection, ER 401) demonstrates, and as the government argued to the jury, the mailboxes are over .2 miles apart. (ER 433; GER 75.)

box on the corner from which Contreras was running when he was seen by Officer Martinez. (ER 249-251; GER 66; ER 402-403.) Defendant's location was no coincidence—as common sense suggests, they kept the getaway car as close as they could to each collection box they fished, to minimize the chance of getting caught.

Third, evidence at trial established defendant's motive, which was to obtain and wash checks. The expert testified that thieves steal mail in order to obtain and "wash" checks, and particularly target blue collection boxes because they tend to have more checks. (ER 304.) Evidence at trial demonstrated that defendant and Contreras stole from blue collection boxes, and there were, in fact, several checks in the stolen mail. (ER 309-310.)

Fourth, defendant made additional false exculpatory statements that were admitted at trial, which demonstrated her consciousness of guilt similarly to the challenged statement that the mail was "already in the car." For example, defendant's repeated statements that she had "just" picked up Contreras on the street and he had put all that mail in the passenger seat when she picked him up (Trial Exhs. 6, 9, 10) are demonstrably untrue based on: (1) the 44 pieces of sticky mail in her

car; (2) Officer Martinez's testimony that the car contained more mail than he had seen Contreras carrying; (3) evidence that the mail was stolen from at least three collection boxes; (4) the undisputed fact that defendant and Contreras had been together at a hotel earlier that evening; (5) defendant's later statements to Inspector Granger, changing her story and admitting that Contreras left and returned to the car more than once with stolen mail; and (6) that she was longtime friends with Contreras, who had a storied history of stealing mail. The jury could draw the same inference from these unchallenged statements as from the challenged statement: that defendant made these untrue exculpatory statements because she knew they had been stealing mail, and she knew she would be punished for it. Because the same exact inferences can be drawn from defendant's properly admitted statements, the admission of the pre-*Miranda* statements was cumulative and harmless beyond a reasonable doubt. *Cf. United States v. Lopez*, 500 F.3d 840, 845 (9th Cir. 2007) (finding a prosecutor's improper comment on the inferences to be drawn from a defendant's post-*Miranda* silence harmless where same inference could be drawn from proper comment on defendant's pre-*Miranda* silence); *United*

*States v. Butler*, 249 F.3d 1094, 1101 (9th Cir. 2001) (finding harmless error where most of the improperly admitted statements were "repetitious of statements" that were properly admitted).

Finally, and independent from all the other evidence, Contreras testified that defendant was a knowing participant in the plan to steal mail. That night, he testified that he and defendant were staying together with "Star" at a hotel in Downey, where Contreras made a fishing tool from materials that defendant provided. (ER 337, 362.) Contreras and defendant then decided to borrow Star's car, drive to another friend's house to buy drugs, and steal mail along the way. (ER 333-334.) They took turns fishing mail out of multiple collection boxes in San Gabriel. (ER 333-334.) They stopped again in San Gabriel on the way back from their friend's house, because there were so many collection boxes there to fish from. (ER 333-334.) Their motive that night was to obtain and wash checks, which is something they had done together before. (ER 337-339.) Each time they stole mail together during their decade-long friendship, they "split the money" in "half." (ER 339.)

Defendant tries to counter this overwhelming, independent evidence of her guilt by arguing that the statement that the stolen mail was "already in the car" was harmful because the government referenced the statement in its opening, closing, and rebuttal arguments. (AOB 39.) But nowhere were these statements used as the principal, sole, or primary evidence of any of the elements establishing guilt. To the contrary, in the government's closing argument, it mentioned the statement in only one, short section, to support the element for liability as a principal that defendant knew the mail was stolen. (ER 435.) It did so after outlining other evidence that independently proved the same point, including defendant's statements to Inspector Granger and the inescapable common-sense conclusion that any similarly-situated driver would know that a pile of recently-accumulated sticky mail was stolen. In fact, defense counsel conceded that this element was met in her closing argument. (ER 443 ("She knew it was stolen. The real issue here is did she possess it.").) The government did not mention the statement at all in the aiding and abetting portion of its closing argument, which provided an alternative, independent basis for defendant's conviction. (ER 430-439.) In opening

statement and rebuttal argument, the government mentioned the statement as one of many sources of corroboration for Contreras's testimony, with or without which the jury could find defendant guilty beyond a reasonable doubt. (*See* Section V.B.5.) (ER 218-219, 457; ER 460 ("The government submits to you that without Marco Contreras, you can find her guilty beyond a reasonable doubt.").) When such substantial independent evidence of guilt supports a defendant's conviction, limited mention of the evidence at issue, particularly in the context of all of the other evidence offered, does not undermine a finding of harmlessness. *Compare United States v. Bushyhead*, 270 F.3d 905, 911, 914 (9th Cir. 2001) (finding the government's reference in opening statement and closing argument to improperly admitted testimony regarding defendant's post-arrest silence harmless beyond a reasonable doubt because "strong" additional evidence supported the verdict), *with United States v. Velarde-Gomez*, 269 F.3d 1023, 1035 (9th Cir. 2001) (holding that the government's improper comment on post-arrest silence in closing was not harmless where it was the government's "principal means of meeting its burden on the critical element of knowledge"); *see also United States v. Martinez*, 239 Fed. App'x 355, 356 (9th Cir. 2007)

(holding that the government's reference to defendant's inculpatory statements in closing argument was harmless, where the government also referenced three other pieces of evidence to demonstrate the fact at issue).[10]

Defendant's defense begins and ends with the claim that she was an unwitting and uninvolved driver. (*See, e.g.*, ER 440.) Apart from the lone pre-*Miranda* statement that defendant now claims prejudiced her, that argument was simply not plausible in light of the evidence at trial. On this record, the overwhelming evidence that defendant was a willing and knowing participant in mail theft rendered the admission of the pre-*Miranda* statements, if in error, harmless beyond a reasonable doubt. *See Butler*, 249 F.3d at 1101 (admission of statements in

---

[10] Defendant also points out that the government told the district court that defendants' statements were inculpatory due to their inconsistency. (AOB 39.) This argument was referring to all of defendant's statements, including those defendant does not challenge on appeal. (ER 170 (asking about the "curbside," "pre-*Miranda*," and "post-*Miranda* statements").) In any event, the government does not dispute that the pre-*Miranda* statements were inculpatory to some degree. But defendant's other statements were similarly inculpatory. That combined with the overwhelming independent evidence of guilt renders any error in admitting the pre-*Miranda* statements harmless beyond a reasonable doubt.

violation of *Miranda* harmless where the "evidence of guilt was overwhelming" and where defendant's "defense—that while in Mexico, someone sold him a used car for $300 that secretly contained $37,000 worth of illegal drugs—is less than compelling").

### 3. This Court Has Often Found Harmless the Type of Statement at Issue: A Limited False Exculpatory Statement

In addition to the substantial, independent evidence of guilt, the statement at issue is the type of statement this Court has often held to be harmless. In determining which erroneously admitted statements may be held harmless, this Court has said that "confession[s]" that "go to the heart of the case," *Williams*, 435 F.3d at 1163, or statements that "provide[] a detailed account of the crime charged," *United States v. Harrison*, 34 F.3d 886, 893 (9th Cir. 1994), will seldom be harmless. By contrast, where independent evidence of guilt exists, courts are more willing to find harmless statements that "concern[] isolated aspects of the crime or may be incriminating only when linked to other evidence." *Williams*, 435 F.3d at 1162.

The challenged statement here falls squarely in the latter category. Defendant did not confess, and she did not admit critical

details of the case. To the contrary, she made a limited, false exculpatory statement, and it was one of many introduced at trial. Only when "linked to other evidence"—for example, the amount of mail in the car that would have required multiple fishing casts, the fact that the mail was stolen from multiple collection boxes, defendant's admission that she waited in the car with stolen mail between at least two fishing trips, and defendant's other inconsistent and demonstrably false statements—did the challenged statement add to the weight of the evidence against her. *Williams*, 435 F.3d at 1162-63. And as described in Section V.B.2, the substantial additional and independent evidence of defendant's guilt rendered even this "linked" inference immaterial and "unimportant in relation to everything else the jury considered on the issue in question." *United States v. Khan*, 993 F.2d 1368, 1376 (9th Cir. 1993).

For that reason, defendant's reliance on *United States v. Garibay*, 143 F.3d 534 (9th Cir. 1998), is misplaced. (AOB 40.) *Garibay* involved a far more extensive statement and far less independent evidence of guilt. In *Garibay*, the government did not even argue that the admission of defendant's statements was harmless. *Id.* at 539. There,

61

the defendant's statements regarding his role in the importation of marijuana into the United States were the only evidence of his knowledge, and thus the only evidence to support a necessary element of the crime. *Id.* at 540 (quoting the district court's observation that "other than that one statement," "I don't really have any evidence to say what [the defendant's] role is"). As a result, this Court found the error was not harmless because the improperly admitted statements "were the thrust of the prosecution's case." *Id.* Not so here, where the statement was not the "thrust" of the case, and where defendant's guilt was proved beyond a reasonable doubt by other evidence. (*See* Section V.B.2.)

### 4. *The Brevity of the Jury's Deliberations Underscore that Any Error Was Harmless*

The jury's quick deliberations here, lasting less than two hours, further supports a harmlessness determination. This Court regularly considers the length of jury deliberations in harmless error analyses. Longer periods of deliberation weigh against a finding that an error was harmless. *See Velarde-Gomez*, 269 F.3d at 1036 (four days of deliberations in a two-count drug importation and possession case weighed against a finding of harmlessness); *United States v. Caruto*,

532 F.3d 822, 832 (9th Cir. 2008) (one and one-half days of jury deliberations after one and one-half days of evidence in a two-count drug importation and possession case weighed against a finding of harmlessness). Here, the jury reached a unanimous verdict after less than two hours. (ER 498-503; GER 76.) This period was even shorter than other periods of deliberation that this Court has held weigh in favor of finding an error harmless beyond a reasonable doubt. *See Lopez*, 500 F.3d at 846 (jury deliberations of two and one-half hours suggested that the error was harmless beyond a reasonable doubt). *Cf. United States v. Pino-Noriega*, 189 F.3d 1089, 1093, 1099 (9th Cir. 1999) (describing a case in which the jury deliberated for approximately two hours and where evidence was "overwhelming" as "not a close case"). The brevity of the jury's deliberations weigh in favor of finding any error harmless beyond a reasonable doubt here as well.

### 5. *Any Marginal Additional Corroboration of Contreras's Testimony Was Likewise Harmless*

Defendant argues that the challenged pre-*Miranda* statement was harmful because it "shored up the testimony" of Contreras, who also told Officer Martinez that the mail was already in the car when he and defendant borrowed it. (AOB 39.) Not so. As an initial matter,

63

defendant vastly overstates the significance of Contreras's testimony, calling him the government's "star witness." (AOB 39.) In fact, as the government argued to the jury, the jury need not have believed any or all of what Contreras said to find defendant guilty. (*See* ER 456-57, 460.) Based only on the amount of mail, the fishing tool, defendant's other false exculpatory statements, the evidence proving that defendant and Contreras stole mail from at least three different collection boxes, the uncontested evidence that they had been driving together since leaving the Quality Inn that evening, and defendant's admission that she waited in the car between Contreras's fishing trips, there is no doubt that defendant was not the unaware driver she purported to be and would have been convicted, at the very least, under the aiding and abetting theory of liability.

Defendant's identification of what she believes to be the "most incriminating portions" of Contreras's testimony—that defendant was involved in making the fishing tool, that defendant fished for mail herself, and that defendant touched the tool and the mail (AOB 40)— just serves to underscore this point. The jury could have disbelieved that defendant ever touched the fishing tool or the mail and still could

and should have found defendant guilty beyond a reasonable doubt of aiding and abetting the possession of stolen mail. (ER 437-438 (arguing it was "sufficient" to find aiding and abetting that defendant "drove Contreras around San Gabriel while he got out and fished mail from at least three collection boxes," or that she stayed in the car "ready to make a quick getaway" once he stole the mail).) As the district court instructed the jury, defendant possessed the requisite knowledge if the jury found that defendant knew of a "high probability" that Contreras possessed stolen mail but "deliberately avoided learning the truth." (ER 490-491.) Defendant's head-in-the-sand defense—that Contreras's accumulation of 44 pieces of mail, with a fishing tool, from at least three different collection boxes, after 3:00 a.m., with no other reason to be pulled over on the side streets of San Gabriel—all occurred without her knowing what was transpiring, is not credible, regardless of Contreras's testimony.

Further, while defendant is correct that certain facts from Contreras's testimony remain uncorroborated, none of the pre-*Miranda* statements (including the statement that the mail was "already in the car") directly bear on any of those uncorroborated facts, and any

65

generalized corroboration provided by the pre-*Miranda* statements would not have meaningfully altered the jury's assessment of Contreras's credibility given the existing corroboration for other important portions of his account.  Significantly, independent evidence corroborated Contreras's testimony that: he and defendant were friends for years (ER 404 (defendant's statement confirming the same)); they were staying together that evening at a Quality Inn hotel in Downey (ER 426 (stipulation from defendant confirming her car was parked at the Quality Inn)); defendant brought her car to the hotel but they did not use it and they used their friend's car instead (ER 426 (same stipulation); ER 404 (defendant's statement that the car was their friend's)); they were on their way to another friend's house to buy drugs (ER 405 (defendant's statement confirming the same)); they stopped in San Gabriel along that route (GER 63 (map showing San Gabriel between the origin (Downey) and destination (Azusa or Arcadia)); ER 405 (defendant stating that Contreras asked her to pull over on their way to buy drugs)); accumulating the mail took many fishing attempts (ER 303-304 (testimony of mail-theft expert confirming the same)); and they fished from multiple different collection boxes in San Gabriel (ER

66

401-03, GER 27 (map identifying the collection boxes supported by witness testimony).) Where details both small (i.e., that they had begun their evening at the Quality Inn) and large (i.e., that they fished from multiple collection boxes) were independently corroborated, there is no reason to believe that a single additional piece of corroboration that did not go to a critical fact at issue in the case would have altered the jury's assessment of Contreras's credibility.

*Noti*, cited by defendant, only supports this conclusion. (AOB 41.) In *Noti*, an importation of drugs and drug trafficking case, the defendant's multiple inculpatory statements admitting that drugs found were his, admitting that he knew members of the drug trafficking organization, and admitting details of his role in the drug trafficking scheme were improperly introduced at trial. 731 F.2d at 612. Aside from those statements, the "bulk of the testimony against [the defendant] was provided by [the] government informant." *Id.* at 616. Because most of the evidence against the defendant was from the informant's testimony and because the informant's testimony was likely corroborated by the improperly admitted statements, the Court found the admission of the statements was not harmless. *Id.*

Unlike in *Noti*, here, Contreras's testimony was not the "bulk" of the testimony against defendant. *Id.* The statements at issue here also do not include confessions to critical details of the crime charged, as they did in *Noti*. Because the statements at issue here were much more limited than those described in *Noti*, they inherently provided much more limited corroboration for Contreras's testimony than the improperly admitted statements did for the informant's testimony in *Noti*. And again, unlike in *Noti*, because there was independent evidence of defendant's guilt not linked to Contreras's testimony, there was additional independent evidence available to corroborate Contreras's testimony. Because the statement at issue here is a limited false exculpatory statement, not admissions of important details, and because there is independent evidence both of defendant's guilt and as corroboration for Contreras's testimony, the infirmities in *Noti* do not exist.

*United States v. Bernal-Obeso*, 989 F.2d 331 (9th Cir. 1993), cited by defendant, is also not on point. (AOB 39.) In *Bernal-Obeso*, the government failed to disclose a cooperating witness's prior felony convictions. *Id.* at 332, 336. The Court explained that, because felony

68

convictions "trench heavily" on a witness's credibility, if the reason for

the failed disclosure was that the informant lied about the conviction,

then that could have been the "proverbial smoking gun" that could have

caused the jury to entirely disregard the informant's testimony. *Id.* at

336. Because the Court could not determine the reason for such a

serious lapse in disclosure, the Court could not assess how it affected

the case. *Id.* at 335. As a result, the Court refused to perform a

harmless error analysis on the existing record, and vacated the

defendant's conviction. *Id.* at 336.

This case is not comparable. Here, the government disclosed all

information in its possession about Contreras's criminal history, prior

bad acts, prior acts of cooperation, and benefits he may receive for his

testimony. Defense counsel extensively cross examined Contreras on

these topics. (ER 339-349, 354-361, 366-375.) Unlike in *Bernal-Obeso*,

this Court can review the record and perform a harmless error analysis,

which makes clear that: (1) even absent Contreras's testimony, the jury

would have found defendant guilty beyond a reasonable doubt; and

(2) any marginal additional indirect corroboration that resulted from

the pre-*Miranda* statement at issue is hardly the "proverbial smoking

gun" of lying about a hidden felony conviction and would not have made a meaningful difference in the jury's evaluation of Contreras's testimony.

## C. This Court Should Remand to the District Court for the Limited Purpose of Amending Special Condition 9 and Correcting Standard Condition 14

### 1. Standard of Review

A district court's decision to impose a condition of supervised release is reviewed for abuse of discretion. *United States v. Weber*, 451 F.3d 552, 557 (9th Cir. 2006). This Court gives "considerable deference" to the district court's determination of supervised release conditions because "a district court has at its disposal all of the evidence, its own impressions of a defendant, and wide latitude." *Id.* (internal quotation marks omitted).

### 2. Legal Framework

Under 18 U.S.C. § 3583(d), conditions of supervised release must: "(1) be reasonably related to the goals of deterrence, protection of the public, and/or defendant rehabilitation; (2) involve no greater deprivation of liberty than is reasonably necessary to achieve those goals; and (3) be consistent with any pertinent policy statements issued

70

by the Sentencing Commission." *United States v. Napulou*, 593 F.3d

1041, 1044 (9th Cir. 2010)).

### 3. *This Court Should Remand to the District Court for the Limited Purpose of Amending Special Condition 9*

Defendant makes a limited challenge to Special Condition 9.

Defendant does not object to the requirement that she must not obtain

legal documentation in anything other than her true legal name, Todd

Paishon. (AOB 43.) Rather, she objects only to the limitation of her use

of the name "Nadine" in social settings without prior approval from her

probation officer. (AOB 43.) Given the limited nature of defendant's

request, and in light of defendant's long history of using the name

"Nadine," the government agrees that remanding to the district court to

amend the condition to permit defendant to use the name "Nadine"

socially, without prior approval of her probation officer, is appropriate.

Special Condition 9 is often an appropriate condition of supervised

release. This is particularly true in cases such as this one, where the

conduct involves stolen mail and washing checks. Given the general

reasonableness of this condition, the government's position here is

limited to the particular facts of this case, in which defendant identifies

as a transgender woman and has a long and demonstrated record of

using the name "Nadine." The Presentence Investigation Report reflects that defendant has used this name since age 18. (PSR ¶ 84.) Contreras, defendant's friend for nearly a decade, testified that he knew defendant by the name "Nadine." (ER 329.) Because the available facts show that defendant has historically used and personally identifies with the name "Nadine," and the district court made no findings regarding how this limited use of "Nadine" would undermine the sentencing goals of deterrence, protection of the public, or rehabilitation, the government agrees that Special Condition 9's prohibition against defendant using the name "Nadine" in social settings without prior approval is a broader intrusion than "reasonably necessary." *Napulou*, 593 F.3d at 1044. Accordingly, the government joins defendant in asking this court to vacate the sentence in part, and remand for the limited purpose of amending Special Condition 9.

### 4. *This Court Should Remand for the District Court to Correct Standard Condition 14*

Imposition of supervised release Standard Condition 14—which has since been invalidated by this Court's decision in *Magdirila*, 962 F.3d at 1158-59—constitutes plain sentencing error. *See United States v. Ped*, 943 F. 3d 427, 433 (9th Cir. 2019) (remanding to cure

72

unconstitutionally vague conditions of supervised release despite defendant's waiver of right to appeal). The government agrees that this error needs to be addressed.

Accordingly, the government requests that this Court vacate the sentence in part, and remand for the limited purpose of allowing the district court "to craft a supervised release condition that accords with [defendant's] criminal history." *Magdirila*, 962 F.3d at 1159.

# VI

## CONCLUSION

For the reasons set forth above, defendant's conviction should be affirmed. Defendant's sentence should be vacated and remanded for the limited purpose of amending Special Condition 9 and correcting Standard Condition 14 as described above.

DATED: October 16, 2020    Respectfully submitted,

           NICOLA T. HANNA
           United States Attorney

           BRANDON D. FOX
           Assistant United States Attorney
           Chief, Criminal Division

L. ASHLEY AULL
Assistant United States Attorney
Chief, Criminal Appeals Section

*/s/ Jenna Williams*

JENNA WILLIAMS
PATRICK CASTAÑEDA
Assistant United States Attorneys
General Crimes Section

Attorneys for Plaintiff-Appellee
UNITED STATES OF AMERICA

## STATEMENT OF RELATED CASES

The government states, pursuant to Ninth Circuit Rule 28-2.6, that it is unaware of any cases related to this appeal.

# CERTIFICATE OF COMPLIANCE

I certify that:

1.     This brief complies with the length limits permitted by Ninth Circuit Rule 32-1 because the brief contains 13,931 words, excluding the portions exempted by Fed. R. App. P. 32(f), if applicable.

2.     This brief complies with the typeface requirements of Fed. R. App. P. 32(a)(5) and the type-style requirements of Fed. R. App. P. 32(a)(6) because it has been prepared in a proportionally spaced typeface (14-point Century Schoolbook) using Microsoft Word 2016.

DATED: October 16, 2020                    */s/ Jenna Williams*

JENNA WILLIAMS
Attorney for Plaintiff-Appellee
UNITED STATES OF AMERICA