CA NO. 20-50008

IN THE UNITED STATES COURT OF APPEALS

FOR THE NINTH CIRCUIT

UNITED STATES OF AMERICA,

      Plaintiff-Appellee,

v.

TODD KAMAWU PAISHON,

      Defendant-Appellant.

DC NO. 2:19-cr-00304-PA-2

———————————

**APPELLANT'S REPLY BRIEF**

———————————

APPEAL FROM THE UNITED STATES DISTRICT COURT FOR THE
CENTRAL DISTRICT OF CALIFORNIA

HONORABLE PERCY ANDERSON
United States District Judge

CUAUHTEMOC ORTEGA
Federal Public Defender
GIA KIM
Deputy Federal Public Defender
321 East 2nd Street
Los Angeles, California 90012-4202
Telephone: (213) 894-4408
Facsimile: (213) 894-0081
Email: Gia_Kim@fd.org

Attorneys for Defendant-Appellant

# TABLE OF CONTENTS

**Page**

I. INTRODUCTION ...........................................................................1

II. ARGUMENT ................................................................................2

    A. Paishon Was "In Custody" for *Miranda* Purposes..............................2

        1. The Supreme Court's Decision in *Howes v. Fields* Does Not Change the "In Custody" Analysis in this Case. ........................2

        2. The Totality of the Circumstances Show That Paishon Was in Custody While Handcuffed in the Back Seat of a Police Car. ...............................................................................7

            a. *Henley* Controls This Case. ..............................................7

            b. *Henley* Is the Only Controlling Authority That Involves Both Handcuffing and Questioning in a Police Car.....................................................................9

            c. Cases Involving *Terry* Stops Are Distinguishable. ........11

            d. The Other Factors Cited by the Government Do Not Outweigh the Handcuffing and Police-Car Setting........14

    B. The *Miranda* Error Was Not Harmless. ..............................................17

III. CONCLUSION.............................................................................21

CERTIFICATE OF COMPLIANCE .......................................................23

# TABLE OF AUTHORITIES

**Page(s)**

## Federal Cases

*Berkemer v. McCarty,*
468 U.S. 420 (1984)................................................................6, 10, 14

*Coleman v. Calderon,*
210 F.3d 1047 (9th Cir. 2000) ................................................................21

*Hart v. Massanari,*
266 F.3d 1155 (9th Cir. 2001) ................................................................7, 8

*Howes v. Fields,*
565 U.S. 499 (2012)................................................................*passim*

*Maryland v. Shatzer,*
559 U.S. 98 (2010)................................................................6

*Miller v. Gammie,*
335 F.3d 889 (9th Cir. 2003) ................................................................6

*Miranda v. Arizona,*
384 U.S. 436 (1966)................................................................4, 17

*Randhawa v. Ashcroft,*
298 F.3d 1148 (9th Cir. 2002) ................................................................17

*Stansbury v. California,*
511 U.S. 318 (1994)................................................................14

*United States v. Bautista,*
684 F.2d 1286 (9th Cir. 1982) ................................................................9, 12, 13

*United States v. Beraun-Perez,*
812 F.2d 578 (9th Cir. 1987) ................................................................15

*United States v. Booth,*
669 F.2d 1231 (9th Cir. 1981) ................................................................13, 14

*United States v. Bravo,*
295 F.3d 1002 (9th Cir. 2002) ................................................................13, 15

# TABLE OF AUTHORITIES

**Page(s)**

**Federal Cases (cont.)**

*United States v. Cervantes-Flores*,
421 F.3d 825 (9th Cir. 2005) ...................................................9, 11

*United States v. Crawford*,
372 F.3d 1048 (9th Cir. 2004) .......................................................6

*United States v. Fornia-Castillo*,
408 F.3d 52 (1st Cir 2005) ........................................................9, 11

*United States ex rel. Haynes v. McKendrick*,
481 F.2d 152 (2d Cir. 1973) ..........................................................20

*United States v. Henley*,
984 F.2d 1040 (9th Cir. 1993) .....................................................2, 7

*United States v. Hudgens*,
798 F.2d 1234 (9th Cir. 1986) ....................................................9, 11

*United States v. Kim*,
292 F.3d 969 (9th Cir. 2002) .........................................................12

*United States v. Lee*,
699 F.2d 466 (9th Cir. 1982) .........................................................10

*United States v. Miles*,
247 F.3d 1009 (9th Cir. 2001) .......................................................11

*United States v. Murray*,
89 F.3d 459 (7th Cir. 1996) ............................................................9

*United States v. Newton*,
369 F.3d 659 (2d Cir. 2004) .........................................................8, 9

*United States v. Nickle*,
816 F.3d 1230 (9th Cir. 2016) .......................................................20

*United States v. Pino-Noriega*,
189 F.3d 1089 (9th Cir. 1999) .......................................................20

iii

# TABLE OF AUTHORITIES

**Page(s)**

**Federal Cases (cont.)**

*United States v. Schultz*,
    442 F. Supp. 176 (D. Md. 1977)............................................................10

*United States v. Treleaven*,
    35 F.3d 458 (9th Cir. 1994) ...............................................................20

*United States v. Wauneka*,
    770 F.2d 1434 (9th Cir. 1985) ......................................................15, 16

**State Cases**

*Commonwealth v. Meyer*,
    488 Pa. 197 (1980)............................................................................10

**Federal Statutes**

18 U.S.C. § 1708 ....................................................................................17

## I. INTRODUCTION

Having convinced the district court that appellant Todd ("Nadine") Paishon was not in custody, the government made the most of the statement she gave while handcuffed and seated in a police car, which it played for the jury and referenced in closing and rebuttal closing. Paishon's statement — that the mail was already in the car —corroborated the shaky testimony of co-defendant Marco Contreras, a five-time felon with a self-admitted history of lying to police. The government entered into a "substantial assistance" plea agreement with Contreras but now claims that his testimony was not crucial to conviction. And despite its insistence on introducing Paishon's unwarned statement, the government now contends that the statement was merely cumulative of other statements she made.

The district court erred on the custody question: a defendant who is handcuffed and placed in a patrol car for an extended period of time faces the restraints on movement and inherent coercive pressures that constitute *Miranda* custody, regardless of assurances that is she is not under arrest and is being handcuffed for safety reasons. Because the government's harmlessness arguments are not supported by the record, this Court must reverse.[1]

---

[1] Because the government agrees with the defense that Special Condition 9 and Standard Condition 14 of supervised release should be vacated and remanded (GAB 70-73), Paishon does not address those arguments in this reply.

## II. ARGUMENT

### A.    Paishon Was "In Custody" for *Miranda* Purposes.

#### 1.    The Supreme Court's Decision in *Howes v. Fields* Does Not Change the "In Custody" Analysis in this Case.

In *United States v. Henley*, 984 F.2d 1040 (9th Cir. 1993), this Court had "no trouble" concluding that a handcuffed defendant, seated in a police car, was in custody under *Miranda*, even though he had been told he was not under arrest.  *Id.* at 1042.  The three most salient facts in *Henley* — handcuffing, placement in a police car, assurance that he was not under arrest — are indistinguishable from the facts here.[2]  In an effort to undermine *Henley*'s precedential effect, the government suggests that the Supreme Court's decision in *Howes v. Fields*, 565 U.S. 499 (2012) ("*Fields*"), added requirements to the "in custody" inquiry that would change the outcome in this case.  (GAB 42-43, 49.)  On the contrary, the *Fields* Court's explanation of the "in custody" factors underscores the correctness of *Henley*'s holding and supports a conclusion that Paishon, like Henley, was in custody.

---

[2] If anything, the facts here are stronger.  On one occasion, Officer Martinez told Paishon that you're "not under arrest *right now*," leaving open the possibility of an arrest later in the interaction.  (Ex. A at 11:05; 2-ER-89, emphasis added.) And, as discussed in the opening brief (AOB 35-36), Officer Martinez twice told Paishon that she was "detained."  (Ex. A at 11:05, 12:09; 2-ER-89–90.)  The government does not dispute a reasonable layperson would understand the term "detained" to mean that she was not free to leave.

It *Fields*, the Supreme Court faced a factual scenario where a state prisoner serving a jail sentence was questioned within the prison for criminal conduct occurring outside the prison walls. *Fields*, 565 U.S. at 502. Therefore, the Supreme Court had to decide whether imprisonment alone was sufficient to create a custodial situation under *Miranda*. *Id.* at 510-11. It is in that context that the Supreme Court explained that "[d]etermining whether an individual's freedom of movement was curtailed . . . is simply the first step in the analysis, not the last. Not all restraints on freedom of movement amount to custody for purposes of *Miranda*." *Id.* at 509. Next, the Supreme Court turned to the "additional question whether the relevant environment presents the same inherently coercive pressures as the type of station house questioning at issue in *Miranda*." *Id.* This "additional question" was important in *Fields*, where the defendant was necessarily subject to restrictions on his freedom of movement by virtue of his status as a prison inmate. But it does not change the analysis or outcome here, where Paishon was driving on a public road before being handcuffed and placed in a patrol car.

Indeed, the Supreme Court's analysis of the "inherently coercive pressures" in *Fields* supports Paishon's custody argument. First, the Supreme Court reasoned that "questioning a person who is already serving a prison term does not generally involve the shock that very often accompanies arrest." *Id.* at 511. It contrasted the prison inmate's situation with "the paradigmatic *Miranda* situation — a person is

3

arrested in him home or on the street and whisked to a police station for questioning," where "detention represents a sharp and ominous change, and the shock may give rise to coercive pressures." *Id*. Even though Paishon was put in a patrol car, and not immediately taken to the police station, she experienced this sort of "sharp and ominous change" in her situation, as she was "abruptly transported from the street into a 'police-dominated atmosphere.'" *Id.* (quoting *Miranda v. Arizona*, 384 U.S. 436, 456 (1966)). Once she was placed in the patrol car, she was separated from her driving companion, and interacted solely with the officers at the scene. (Ex. A at 11:47-1:18:08; 2-ER-90–115.)

Second, Paishon, unlike the prison inmate in *Fields*, had an incentive to speak to secure her release from the patrol car. In *Fields*, the Supreme Court reasoned that "a prisoner, unlike a person who has not been sentenced to a term of incarceration, is unlikely to be lured into speaking by a longing for prompt release." *Fields*, 565 U.S. at 511. That this "longing for prompt release" existed here is borne out by the fact that, as her placement in the police car dragged on, Paishon began trying to speak to Officer Martinez, made spontaneous statements to the officers, and twice asked whether she would be "arrested." (Ex. A at 32:36, 33:25, 33:48–34:09, 37:13–37:18, 41:11, 46:06–46:24, 47:09–47:30, 54:39, 56:03; 2-ER-102–109.) *Fields* makes clear that if a person is pressured to speak in "the

hope that, after doing so, he will be allowed to leave and go home," this circumstance contributes to the custodial nature of the situation. *Id.* at 511.

Third, the Supreme Court noted in *Fields* that "a prisoner, unlike a person who has not been convicted and sentenced, knows that the law enforcement officers who question him probably lack the authority to affect the duration of his sentence." *Id.* at 512. Here, by contrast, a reasonable person in Paishon's situation would have reason to think that cooperation with the officers would result in more favorable or lenient treatment down the road.

Other factors discussed in *Fields* indicate that Paishon was in custody while handcuffed in the police car. Although the Supreme Court downplayed the significance of isolation for a prisoner, because "[f]ellow inmates are by no means necessarily friends," it recognized that "[w]hen a person who is not serving a prison term is questioned, isolation may contribute to a coercive atmosphere by preventing family members, friends, and others who may be sympathetic from providing either advice or emotional support." *Fields*, 565 U.S. at 512-13. Here, Paishon was separated from Contreras and moved out of public view. The resulting isolation increased the coercive nature of the surroundings.

Finally, the factor the Supreme Court found "most important" — that Fields was repeatedly told he was free to leave and return to his cell — was missing here. *See id.* at 503, 515, 517. Paishon was not told she was free to leave, and in fact

never left the police car until arriving at the police station. "Being aware of the freedom to depart, and in fact departing after questioning at a law enforcement office, suggest that the questioning was noncustodial." *United States v. Crawford*, 372 F.3d 1048, 1060 (9th Cir. 2004) (en banc).

For all of these reasons, *Fields* does not undermine the precedential effect of *Henley*. This Court remains bound by *Henley* unless it is "clearly irreconcilable with the reasoning or theory" of *Fields*. *Miller v. Gammie*, 335 F.3d 889, 893 (9th Cir. 2003) (en banc). The government makes no argument regarding irreconcilability, and, considering the two cases' very different fact patterns, no clear conflict exists. And contrary to the government's suggestion (GAB 42-43), the Supreme Court in *Fields* did not break any new ground in declining to rely solely on the freedom-of-movement inquiry to determine the custody question. Rather, the Supreme Court has traced this proposition back to its longstanding decision in *Berkemer v. McCarty*, 468 U.S. 420 (1984). *See Fields*, 565 U.S. at 1189 (citing *Berkemer*, 468 U.S. at 437); *Maryland v. Shatzer*, 559 U.S. 98, 112-13 (2010) (citing *Berkemer*, 468 U.S. at 437). On the facts of this case, *Fields* does not change the outcome reached by application of the well-established "in custody" factors.

**2.  The Totality of the Circumstances Show That Paishon Was in Custody While Handcuffed in the Back Seat of a Police Car.**

While the government acknowledges that a "totality of the circumstances" inquiry governs the custody determination, it undertakes an atomized analysis of the circumstances present in Paishon's case.

**a.  *Henley* Controls This Case.**

The government points to no case that undermines the precedential force of *Henley*, in which the factors of handcuffing and placement in a police car were "easily" sufficient for this Court to conclude that a defendant was in custody. *Henley*, 984 F.2d at 1042.  And it offers no sound basis on which to distinguish *Henley*.  It speculates that the interrogation in *Henley* did not occur after an investigatory car stop, and notes that *Henley* is silent on whether the suspect was told he was free to leave.  (GAB 43.)  But this sort of speculation runs counter to this Court's treatment of binding authority: "Using the techniques developed at common law, a court confronted with apparently controlling authority must parse the precedent *in light of the facts presented* and the rule announced."  *Hart v. Massanari*, 266 F.3d 1155, 1172 (9th Cir. 2001) (emphasis added).  Further, in a published opinion, "the court must be careful to recite all facts that are relevant to its ruling, while omitting facts that it considers irrelevant. Omitting relevant facts will make the ruling unintelligible to those not already familiar with the case; including inconsequential facts can provide a spurious basis for distinguishing the

7

case in the future." *Id.* at 1176. In *Henley*, this Court evidently thought that the facts presented (a handcuffed defendant in a police car, who was told he was not under arrest) were the only relevant facts. *Henley* cannot be distinguished based on facts that either did not exist or were not thought important enough to recite.

The government's attempt to distinguish the Second Circuit's persuasive decision in *United States v. Newton*, 369 F.3d 659 (2d Cir. 2004), is equally unavailing. In *Newton*, the Second Circuit held that a handcuffed suspect was in custody, despite the fact that officers had told him he was not under arrest and that the handcuffing was for safety reasons. *Id.* at 676-77. The government argues that the situation in *Newton* was less volatile and dangerous than the situation here (GAB 43), but it is mistaken. Officers had arrived at Newton's apartment to conduct a parole search after Newton's mother reported that he had threatened to kill her and her husband, and was storing a gun by the front door of the home they shared — circumstances the Second Circuit sufficiently serious to support *Miranda*'s "public safety" exception. *Id.* 663, 678. Here, Paishon was suspected of mail theft, and had already been frisked for weapons before being handcuffed and put in the police car. (Ex. A at 10:04; 2-ER-88.) And, by telling Paishon that the handcuffs were "based on time of day," and "for safety" (Ex. A at 11:10; 2-ER-89), Officer Martinez did not convey appreciably more information than the officer

in *Newton*, who advised Newton that the handcuffs were for his and the officers'

safety. *Id.* at 663.

### b. *Henley* Is the Only Controlling Authority That Involves Both Handcuffing and Questioning in a Police Car.

The government's citations to cases regarding the use of handcuffs and

patrol cars during *Terry* stops are inapposite. First, cases involving *either*

handcuffs *or* a patrol car are readily distinguished from this case, where both

elements are present. *See United States v. Cervantes-Flores*, 421 F.3d 825, 828

(9th Cir. 2005) (handcuffs only), *overruled in part on other grounds by Melendez-*

*Diaz v. Massachusetts*, 557 U.S. 305 (2009); *United States v. Hudgens*, 798 F.2d

1234, 1236-37 (9th Cir. 1986) (police car only); *United States v. Bautista*, 684 F.2d

1286, 1287-88 (9th Cir. 1982) (handcuffs only); *see also United States v. Fornia-*

*Castillo*, 408 F.3d 52, 57 (1st Cir 2005) (handcuffs only);[3] *United States v.*

*Murray*, 89 F.3d 459, 462 (7th Cir. 1996) (police car only). But it is the

combination of physical restraint (handcuffs) and the removal from a public space

to a police-dominated atmosphere (police car) that marks this case and makes it

effectively indistinguishable from *Henley*.

---

[3] Unlike here, the government in *Fornia-Castillo* did not seek to introduce at trial the statement the defendant made while handcuffed. *Fornia-Castillo*, 408 F.3d at 64.

Significantly, the Supreme Court in *Berkemer* evidently viewed the police-car setting as important to the custody inquiry. In *Berkemer*, the Supreme Court contrasted the situation of a driver in a typical traffic stop, who was not in custody, with situations where a suspect was held for longer periods of time in a "squad car." *See Berkemer*, 468 U.S. at 441 n.34 (contrasting short period of time that elapsed between stop and arrest with *Commonwealth v. Meyer*, 488 Pa. 197, 301, 307 (1980), where a driver who had been "detained for over one-half-hour, part of the time in a patrol car," was held to have been in custody); *id.* at 442 n.36 (contrasting modest number of questions and simple sobriety test administered in public view to *United States v. Schultz*, 442 F. Supp. 176, 180 (D. Md. 1977), where suspect was "subjected to persistent questioning in the squad car . . . and denied permission to contact his mother").

This Court has accorded similar weight to the police-car setting. In *United States v. Lee*, 699 F.2d 466 (9th Cir. 1982), this Court affirmed the district court's grant of a suppression motion, where "Lee was questioned in a closed FBI car with two officers for well over an hour while police investigators were in and around his house." *Id.* at 468. It did so even though the defendant had not been "forced" into the FBI car, and — unlike here — had been told that "he was free to leave the car or terminate the interview at any time." *Id.* at 467-468.

10

This Court's decision in *Hudgens* is not to the contrary. In *Hudgens*, this Court held that a defendant not in custody simply because his voluntary statements were made in a police car. *Hudgens*, 798 F.2d at 1237. But unlike Paishon, Hudgens had called the FBI to initiate a discussion of bank robberies, a fact that was crucial to this Court's decision, and he was not patted down or handcuffed until after making his statement. *Id.* at 1236-37.

### c. Cases Involving *Terry* Stops Are Distinguishable.

Further, a number of the cases cited by the government involve *Terry* stops, short encounters dissimilar from the lengthy detention here. Generally, a *Terry* stop "involves no more than a brief stop, interrogation and, under proper circumstances, a brief check for weapons." *United States v. Miles*, 247 F.3d 1009, 1012 (9th Cir. 2001) (internal quotation marks and citation omitted). Tellingly, the government does not attempt to justify Paishon's prolonged detention in the police car as a *Terry* stop, and therefore those cases are of little to no persuasive value. *See, e.g.*, *Cervantes-Flores*, 421 F.3d at 830 (handcuffs used during *Terry* stop after defendant led agent on chase into the desert); *Fornia-Castillo*, 408 F.3d at 63-65 (handcuffs used temporarily by only officer on the scene during *Terry* stop on busy, public street).

This Court's decision in *Bautista* is instructive. In *Bautista*, this Court concluded that handcuffing during separate questioning of two bank robbery

11

suspects did not convert "a routine Terry stop" into custody, where the questioning occurred on the street in an affluent residential neighborhood in the afternoon, and the defendants were not confronted with evidence of guilt. *Bautista*, 684 F.2d at 1287, 1292. This Court also affirmed the district court's finding that use of the handcuffs was reasonable, in light of the nature of the criminal activity (armed bank robbery) and the possibility that a third robber was in the vicinity. *Id.* at 1290. But, as this Court has explained, the reasonableness of restraints under the Fourth Amendment is not dispositive of the Fifth Amendment custody question:

> In the Fourth Amendment context, locking doors and restricting the occupants' movement are often reasonable police procedures to control access to a scene during the execution of a search warrant. . . . But whether an individual detained during the execution of a search warrant has been unreasonably seized for Fourth Amendment purposes and whether that individual is "in custody" for *Miranda* purposes are two different issues.

*United States v. Kim*, 292 F.3d 969, 976 (9th Cir. 2002). And even apart from the different legal context, *Bautista* does not help the government.

Aside from the fact of handcuffing, *Bautista* differs from this case in every important respect. The stop in *Bautista* occurred on a residential street during the day, *id.* at 1287, as opposed to Paishon's patrol-car interrogation in a business area in the middle of the night. (2-ER-134–135.) Unlike Paishon, the suspects in *Bautista* were not confronted with evidence of guilt. *Id.* at 1292. And while this Court in *Bautista* concluded it was reasonable for one officer, outnumbered, to

handcuff two men suspected of armed bank robbery, continued use of the handcuffs after a second officer arrived on the scene presented a "a much closer question." *Id.* at 1289. Here, as the video shows and the transcript indicates, a second officer was on the scene controlling Contreras as Officer Martinez places Paishon in the patrol car. (Ex. A at 11:47; ER 90.) The crime of which Paishon was suspected, mail theft, is nowhere near as dangerous as the armed bank robbery in *Bautista* that justified continued handcuffing, especially since Paishon had already been patted down for weapons. Under these circumstances, a reasonable person would not sense such an overriding need for public safety to require handcuffs, particularly where Officer Martinez did not indicate that the handcuffing would be temporary. *Cf. United States v. Bravo*, 295 F.3d 1002, 1005, 1011 (9th Cir. 2002) (in case where handcuffing lasted for one to two minutes, officer's statements that handcuffs were only temporary "helped negate the handcuffs' aggravating influence").

This Court's decision in *United States v. Booth*, 669 F.2d 1231 (9th Cir. 1981), is similarly unhelpful to the government. In *Booth*, the police officer on a motorcycle stopped the defendant on the street, patted him down for weapons, advised him that he matched the description of a bank robbery suspect, and handcuffed him, advising him that it was for officer safety. *Id.* at 1234. While waiting for a police car he had requested, the officer asked the defendant about

identification, his reason for being in the area, and prior arrests. *Id.* While this Court stated that handcuffing "does not necessarily dictate a finding of custody," it rejected the government's argument that the encounter was merely a *Terry* stop and affirmed the district court's determination that Booth was in custody. *Id.* at 1236. The coercive elements in this case, which included placement in a police car and confrontation with evidence of guilt, far exceeded those in *Booth*.

### d. The Other Factors Cited by the Government Do Not Outweigh the Handcuffing and Police-Car Setting.

Preliminarily, the government at times misstates *Miranda*'s reasonable-person inquiry. Contrary to the government's argument, the question is not whether a reasonable person in the suspect's situation would have understood that "she was not under arrest," that the interaction was "a restraint associated with a formal arrest," or that "her temporary detention did not amount to arrest." (GAB 40, 41, 42.) Rather, the relevant question is whether the suspect was "subjected to restraints *comparable* to those associated with a formal arrest," *Berkemer*, 468 U.S. at 441 (emphasis added). In other words, the reasonable-person inquiry turns on whether "a reasonable person [would] have felt he or she was not at liberty to terminate the interrogation and leave," not on her understanding of her legal status (under arrest or not under arrest). *Fields*, 565 U.S. at 509 (internal quotation marks and citation omitted); *see also Stansbury v. California*, 511 U.S. 318, 322 (1994) (per curiam) (question is "how a reasonable person in the position of the individual

being questioned would gauge the breadth of his or her freedom of action")
(internal quotation marks and citation omitted). For this reason, whether Paishon
understood herself to be under formal arrest is largely irrelevant to the question
whether she was in custody. (GAB 42.) By the same token, "an officer cannot
negate a custodial situation simply by telling a suspect that he is not under arrest."
*Bravo*, 295 F.3d at 1011.

The lack of sophisticated interrogation tactics and the relative brevity of the
questioning are not particularly significant for two reasons. First, because of the
physical restraints here, the Court need not rely on psychological coercion to
conclude that Paishon was in custody. In *United States v. Beraun-Perez*, 812 F.2d
578 (9th Cir. 1987), by contrast, the defendant had not been handcuffed and was
not arrested after the interrogation. *Id.* at 579-80. Therefore, the Court focused on
the law enforcement officers' use of "psychological restraints" to affirm the district
court's custody finding. *Id.* at 580-81. Second, this offense was not particularly
complex or serious. The government's comparison of the interrogation here with
the four interviews in *United States v. Wauneka*, 770 F.2d 1434 (9th Cir. 1985), is
therefore inapt. In *Wauneka*, the defendant was charged with serious, violent
crimes — raping and stabbing one woman and shooting a second woman in the
head. *Id.* at 1436. Under these circumstances, it is unsurprising that the
questioning in the third interview "progressed for over an hour and turned

15

accusatory." *Id.* at 1439. But nothing in *Wauneka* suggests that heated, hour-long interviews are a prerequisite for custody, especially when a person suspected of a simple offense has been handcuffed and placed in a police car.

Further, Paishon disputes the government's characterization of Officer Martinez's questioning as not aggressive, coercive, or deceptive in tone. At the curbside, Officer Martinez elicited from Paishon that she had just picked up Contreras from a friend's house. (Ex. A at 10:50-10:55; 2-ER-89.) Therefore, his follow-up question while she was handcuffed in a police car took on an accusatory tone by suggesting that she had been untruthful: "What's up? What were, honestly, what were you guys doing?" (Ex. A at 26:57; 2-ER-99.) Within a short time, Officer Martinez proceeded to employ several of the psychologically coercive questioning tactics described in *Miranda*: he isolated Paishon in a location of his choosing (the police car), "highlight[ed] the isolation and unfamiliar surroundings" by "display[ing] an air of confidence" in her guilt,[4] resorted to "a show of some hostility,"[5] and kept her "off balance, . . . by trading on [her]

---

[4] Officer Martinez stated: "So you're not willing to tell me where you guys got the mail? It's fresh, from our city." (Ex. A at 27:20; 2-ER-99)

[5] "Are you lying to me? . . . You know, I've been doing this a lot longer than you think, right?" (Ex. A at 27:07-27:10; 2-ER-99.)

insecurity about [herself] or [her] surroundings."[6] *Miranda*, 384 U.S. at 449, 450,

455. Although psychological coercion is not the primary reason for concluding

that Paishon was in custody, it was not lacking here.

## B. The *Miranda* Error Was Not Harmless.

The government cannot establish harmlessness beyond a reasonable doubt.

In arguing harmlessness, the government overstates the weight of the evidence

against Paishon, understates the importance of Contreras to its case and the extent

of Contreras's credibility issues, and ignores the special corroborative value of

Paishon's statement that the mail was already in the car.

Contrary to the government's assertion, the evidence against Paishon was

not overwhelming. Although it was undisputed that Paishon was driving a car

containing mail in the passenger seat floor area, that alone is insufficient for

conviction as a principal under 18 U.S.C. § 1708. The jury was instructed that

possession of an item means the person "knows of its presence and has physical

control of it, or knows of its presence and has the power and intention to control

it." (3-ER-488–489.) *See Randhawa v. Ashcroft*, 298 F.3d 1148, 1153 (9th Cir.

2002) (possession in Section 1708 is "equivalent to an exercise of control").

Conviction as an aider and abettor required proof beyond a reasonable doubt that

---

[6] Although it was past 3:00 a.m., Officer Martinez repeatedly told Paishon that it was not yet 12:30 a.m. (Ex. A at 28:23-28:36; 2-ER-101.)

Paishon acted with the intent to help Contreras possess stolen mail. (3-ER-490.)
The defendant must act "before the crime was completed," and the requisite intent
exists only when the defendant "actively participates in a criminal venture with
advance[] knowledge of the crime and having acquired that knowledge when the
defendant still had a realistic opportunity to withdraw from the crime." (3-ER-
490.) Although there was circumstantial evidence by which the jury could infer
that Contreras fished from multiple mailboxes in the vicinity, the only direct
evidence of Paishon acting before the crime was completed, with intent to facilitate
the crime, came from the mouth of Contreras, the government's cooperating
witness.[7]

The government disclaims heavy reliance on Contreras's testimony, even as
it details his account of Paishon's participation as part of the "overwhelming"
evidence against her. (GAB 56, 64.) But the government evidently thought that
Contreras's evidentiary contributions were important enough to offer a repeated
felon with — in the government's words— a "storied history of stealing mail"
(GAB 55) a "substantial assistance" plea agreement to testify against Paishon. (3-

---

[7] The government cites expert testimony on mail thieves targeting checks as
evidence of Paishon's motive. (GAB 54.) But without specific evidence showing
Paishon's involvement in check-washing, aside from Contreras's uncorroborated
testimony that he and Paishon engaged in that activity together, this general
testimony regarding the pecuniary motive for mail theft is of scant probative value.

ER-357–359.)  Contreras was the only witness who testified to Paishon's actions before driving to San Gabriel (preparing the fishing tool, engaging in other instances of mail theft and check-washing), during the act of obtaining the mail (actively participating in fishing and driving the car to multiple stops), and after being stopped by Officer Martinez (agreeing on a false story about the mail already being in the car).  As the government told the jury, "When you think of Contreras, think of complete story."  (3-ER-457.)  But aside from the introduction of Paishon's statement that the mail was already in the car, none of the most incriminating points was corroborated in any way.  Contreras's testimony was thus the linchpin for Paishon's conviction as a principal who controlled, or intended to control, the stolen mail, as well as an aider and abettor who sought to facilitate Contreras's own possession of the mail.

The corroborative effect of the challenged statement differentiates it from what the government terms other "false exculpatory statements," such as Paishon's statement that Contreras had entered the car carrying all of the mail.  (GAB 54-56.) Although all false exculpatory statements may reflect consciousness of guilt (GAB 55-56), Paishon's statement about the mail already being in the car was unique because it dovetailed with Contreras's testimony regarding their agreement to lie to law enforcement upon being pulled over.  The government stated in rebuttal closing, "[W]hen you think about Contreras, think about corroboration."  (3-ER-

457.) It then pointed specifically to the video clip in which Paishon said the mail was already in the car as matching Contreras's testimony about the agreed-upon lie. (3-ER-457.) And, because Contreras was a felon who had entered into a substantial assistance plea agreement, his testimony was sorely in need of corroboration. *See United States v. Nickle*, 816 F.3d 1230, 1236 (9th Cir. 2016) ("Because it was entirely up to the government to determine, after the witnesses testified, whether they had earned that benefit by providing 'substantial assistance,' they had a strong incentive to testify in a way that would please the government. . . . Certainly, a juror might believe that the lure of that reward would color the witnesses' testimony."); *United States v. Treleaven*, 35 F.3d 458, 461 (9th Cir. 1994) (corroboration of witness's testimony "might have been important given [witness's] status as an indicted felon testifying pursuant to an offer of leniency").

Finally, the government's "argument from the length of jury deliberations — used so often — cuts both ways[.]"[8] *United States ex rel. Haynes v. McKendrick*, 481 F.2d 152, 161 n.14 (2d Cir. 1973). The jury's relatively quick verdict might

---

[8] The government's reliance on *United States v. Pino-Noriega*, 189 F.3d 1089 (9th Cir. 1999), for this point is misplaced. (GAB 63.) Although the deliberations in that case lasted approximately two hours, and this Court found the constitutional error in that case to be harmless, it did not cite the length of deliberations as a factor in its harmlessness analysis. *Id.* at 1093, 1099. But in *Pino-Noriega* this Court did rely on the circumstance — not present here — that the government did not stress the inference of guilt to be drawn from the allegedly improper evidence. *Id.* at 1099.

well reflect the *prejudicial* impact of evidence of the constitutional error. For instance, in *Coleman v. Calderon*, 210 F.3d 1047 (9th Cir. 2000), the fact that a jury returned a death verdict in less than three hours did not demonstrate the harmlessness of an unconstitutional instruction that informed the jury of the governor's authority to commute a sentence of life imprisonment without parole to life imprisonment with the possibility of parole. *Id.* at 1051. Rather, this Court reasoned: "The short period of deliberation is more likely explained by the jurors' focus on the fear Coleman might be paroled if he were not sentenced to death, and their singular attention to that concern to the exclusion of the other factors they were instructed to consider." *Id.* Here, likewise, the government misreads the import of the length of deliberations following erroneous admission of evidence — the defendant's own words — that corroborated a key percipient witness's testimony. At a minimum, no strong inference can be drawn by the length of deliberations in an uncomplicated, one-count case.

## III. CONCLUSION

For the foregoing reasons, as well as the reasons set forth in the opening brief, this Court should reverse the district court's denial of Paishon's suppression motion and remand for further proceedings.

Even if this Court does not reverse the district court's denial of the suppression motion, it should vacate Special Condition 9 and Standard Condition

14 and remand to the district court. Because Standard Condition 14 is included in General Order 18-10, this Court should also vacate the judgment's two references to complying with General Order 18-10 in its entirety. (1-ER-52-54.)

Respectfully submitted,

CUAUHTEMOC ORTEGA
Federal Public Defender

DATED: December 11, 2020  By *s/ Gia Kim*
           GIA KIM
           Deputy Federal Public Defender
           Attorney for Defendant-Appellant

## CERTIFICATE OF COMPLIANCE

Pursuant to Fed. R. App. 32(a)(7)(C) and Circuit Rule 32-1, I certify that this reply brief is proportionally spaced, has a typeface of 14 points or more, and contains approximately 5,188 words.

DATED:  December 11, 2020       *s/ Gia Kim*
                                    GIA KIM